# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00257-CR

**Roger Doyle Wood, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
## NO. D-1-DC-07-300048, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## O P I N I O N

A jury found appellant guilty of murder, and the trial court assessed his punishment at thirty-seven years' imprisonment. *See* Tex. Penal Code Ann. § 19.02 (West 2003). Appellant contends that the evidence is legally and factually insufficient to sustain the guilty verdict, that his constitutional confrontation right was violated by the admission of testimonial hearsay, and that he was erroneously denied an instruction on the lesser included offense of assault. Finding no reversible error, we affirm the judgment of conviction.

## BACKGROUND

The body of George Wessberg was found on the morning of January 7, 2007, lying beneath the Interstate 35 overpass at Wells Branch Parkway in Austin. Wessberg was one of several homeless men who lived in the area and "flew signs," *i.e.*, begged for money, where Wells Branch

Parkway intersects the interstate highway's service roads.[1]  A broken bottle of Hot Damn Cinnamon Schnapps was found near the body, as was a broken umbrella.  Wessberg's jacket had been pulled over his head, his pants were pulled down to mid-thigh, and his boots were off.  A video of the crime scene taken while the body was still present was shown to the jury.  From the condition of Wessberg's body and the disarray of his clothing, police suspected that he had been beaten and robbed.

The State's medical expert testified that Wessberg died as a result of blunt force trauma.  The medical examiner opined that Wessberg's injuries were not consistent with a fall or other accident, but were consistent with being beaten with a bottle, an umbrella, a cane, or a length of heavy chain.

Kim Lindell was one of the homeless men who frequented the area. He testified that on the morning of January 7, he had been at a nearby service station when he saw the police at the intersection.  Lindell walked over to see what was happening, and he identified Wessberg's body.  That morning, Lindell was wearing a jacket stained with what appeared to be blood.  Lindell testified that he had scraped his hand and that the blood was his.  Lindell was also carrying a knife that had matter of some sort on the blade.  Lindell testified that he believed that it was liverwurst.  Although Lindell's coat and knife were seized by the police, they were apparently never subjected to any sort of testing.

Lindell suggested to the police that they speak to appellant and Paul Hall at a church located on Wells Branch Parkway two blocks west of the intersection.  The evidence reflects that

---

[1]  We will hereafter refer to this area as "the intersection."

2

homeless persons were allowed to sleep in a sheltered porch area on one side of the church building, and that Wessberg, Hall, and appellant regularly slept there. Lindell testified that a few days before the murder, he had warned Wessberg to be careful around appellant because Wessberg's VA check was due, and appellant was not well known to the others.

Officers found Hall and appellant at the church that morning, and both men were taken to the police station for questioning. During his interview, which was video-recorded and introduced in evidence, appellant told Detective Manuel Fuentes that he and Wessberg had spent part of the previous day, January 6, flying signs at the intersection. Later, they sat under the overpass and drank. Appellant knew that Wessberg had a history of alcohol-related seizures. He told Fuentes that Wessberg fell and hit his face on the pavement at about 6:00 p.m. that evening, but he said that Wessberg did not appear to be seriously hurt. Appellant said that Wessberg had remained at the intersection when he, appellant, left at about 7:30 p.m.

Hall testified that he also spent January 6 flying his sign at the intersection. Hall said that he left the intersection at "dark thirty" and walked to the church to spend the night. According to Hall, appellant and Wessberg were sitting at the intersection and sharing a bottle of "Hot Damn" when he left. Hall testified that appellant came to the church later that night and that "he was having a fit, real anxious and really messed up." Hall added, "[Y]ou could tell [appellant] was panicky and I didn't know what was going on."

After giving a statement to the police on January 7, Hall returned to the church with police officers to show them the area where he, appellant, and Wessberg slept.[2] An officer made a video recording, which was introduced in evidence and played for the jury without sound while Hall testified. Hall showed the officers a pair of size 40 x 32 jeans that appeared to have blood stains. Hall told the officers that the jeans belonged to appellant. Appellant told the police, apparently before learning that these jeans had been seized, that he wore size 40 x 32.

Officers swabbed the inside of Hall's and appellant's mouths for DNA testing. Hall testified that appellant told him that he did not want to give the sample and was "real nervous." Hall recalled appellant telling him that "he really messed up" and saying "he would do me just like he did George."

Appellant was arrested on January 9 while panhandling for money in northwest Austin. The police also seized appellant's jacket and the metal cane he was using. The arrest was videotaped. Appellant had what appears to be the same cane with him during his January 7 police interview.

Tina Vasquez testified that at about 9:00 p.m. on January 6, she and her husband stopped at the intersection as they drove home from dinner. There was not a lot of light, but she noticed a man wearing a jacket and a baseball cap "poking" or "prodding" a second man with a cane. (Appellant was wearing a baseball cap during his police interview and at the time of his arrest.) The second man was sitting on the ground. The man with the cane appeared to be upset, but his

---

[2] Hall's January 7 statement was recorded, but it was not played for the jury. The statement was introduced for record purposes as Defense exhibit 3.

4

movements, according to Vasquez, were not violent. Vasquez described the man with the cane as being white, about six feet tall, with brown hair and a moustache or goatee. (Appellant had a goatee at the time of the murder.) Vasquez testified that appellant's cane was similar to the one she saw and appellant's jacket was similar to the one the man with the cane was wearing. Vasquez said that she did not consider this incident to be significant until January 9, when she saw a news article about Wessberg's murder with a photograph of appellant. Vasquez testified that she recognized the photograph as being the man with a cane she saw at the intersection on January 6. Vasquez contacted the police and later confirmed her identification of appellant's photograph. Vasquez was never shown a photographic lineup, and she could not identify appellant at trial.

Jeremy Perez testified that he stopped at the intersection at about midnight on January 6. He said that he saw two men under the overpass, in an area lit by overhead lights. One man was lying on the ground, while the second man stood over him, "prodding" or "nudging" him with a cane, crutch, or stick. Perez said that appellant's cane was similar to the object he saw. Perez testified that he had seen the man with the cane before, at the intersection. He described the man as large, with shoulder-length hair and a goatee. Perez said that appellant's jacket and Wessberg's jacket were similar to the jackets worn by the two men he saw that night. Like Vasquez, Perez thought nothing more of what he had seen until he heard news accounts of the murder. He contacted the police and later selected appellant's photograph in a photo lineup. Perez identified appellant at trial as the man he saw at the intersection on January 6, prodding the second man with a cane.

A third motorist, Aric Reil, did not testify but gave a video-recorded statement to the police that was introduced in evidence. Reil said that he drove through the intersection at about

5

9:20 p.m. on January 6. He noticed two men lying on the ground. One man, who was propped up on an elbow, was hitting the other man with the heel of his hand. Reil was unsure of his descriptions, but he recalled the man doing the hitting or shoving as being heavy-set, with a full beard.

Blood was found on appellant's cane, and DNA testing showed that the blood was Wessberg's. The size 40 x 32 jeans seized at the church and identified by Hall as belonging to appellant were also shown to be stained with Wessberg's blood. Biological material, but not blood, was found on the waist and in the crotch of the jeans; this material contained a mixture of Wessberg's and appellant's DNA, but did not contain Hall's DNA. Wessberg's blood was also found on the pieces of the broken Hot Damn schnapps bottle and on the canopy of the broken umbrella found near Wessberg's body. A mixture of Wessberg's and appellant's DNA was found on the umbrella handle, but the nature of the biological material could not be determined.

The State's final witness was Johnny Anthony, a jail inmate with a record of felony convictions who was awaiting trial for burglary. Anthony testified that he met appellant in jail, and that appellant told him that he was accused of murder. Anthony said that during the course of several subsequent conversations, appellant told him that he and two men named George Wessberg and Paul Hall flew signs at the intersection of "Wells Branch and 35," a location with which Anthony claimed to be unfamiliar, and slept at a nearby church.[3] Appellant told Anthony that on the day of the murder, he and Wessberg panhandled at the intersection, then began to drink and smoke

---

[3] Anthony testified that he was not from Austin, was unfamiliar with the city, and had been arrested only two months after he arrived.

crack. Appellant told Anthony that he hit Wessberg with a "smiley" after Wessberg refused to give him money. Anthony testified that he had been unfamiliar with the term "smiley," and that appellant told him that it was "a long chain, it's got about 10 or 15 links on it, long enough to carry a pad—like a big Master lock padlock. And the reason they call it a smiley is when it hits somebody in the mouth, it knocks their teeth out like a smile." According to Anthony, appellant said that he hit Wessberg repeatedly with the smiley until he stopped moving. Appellant also mentioned an umbrella and a broken liquor bottle. Appellant told Anthony that his jeans were soaked with blood and that when he returned to the church, he placed the jeans in a pile of clothes belonging to Hall. Anthony testified that he had never seen or met Hall, but Anthony was able to accurately describe Hall based, he said, on what he was told by appellant. Anthony said that appellant expressed a dislike for Hall, and that appellant told him that he had threatened to kill Hall if he did not keep quiet.

## LEGAL SUFFICIENCY

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In a legal sufficiency review, all the evidence is reviewed in the light most favorable to the verdict; it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 234 S.W.3d at 778.

7

Appellant has briefed his legal and factual sufficiency points together, and his argument consists largely of an attack on the credibility of the State's witnesses and an assertion of alternative hypotheses inconsistent with his guilt. These arguments may be appropriate in a factual sufficiency challenge, but they are not appropriate in a legal sufficiency challenge, where we must assume that the jury believed all the inculpatory testimony and drew all reasonable inculpatory inferences that are supported by the evidence. *Id.*

When viewed in the light most favorable to the verdict, the evidence is plainly sufficient to support the conviction. Appellant confessed his guilt to Anthony. This confession was corroborated by the presence of Wessberg's blood on appellant's jeans and cane. It was also corroborated by Hall's testimony describing appellant's behavior on the night of the murder, and by the testimony of Vasquez and Perez, who saw a man matching appellant's description "poking" another man with a cane at the intersection. Point of error one is overruled.

**FACTUAL SUFFICIENCY**

In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the evidence, the reviewing court may disagree with the result in order to prevent a manifest injustice. *Johnson*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The evidence will be deemed factually insufficient if: (1) the evidence supporting the verdict is so

8

weak as to make the finding of guilt clearly wrong or manifestly unjust, or (2) considering the conflicting evidence, the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Goodman v. State*, 66 S.W.3d 283, 285 (Tex. Crim. App. 2001).

Appellant attacks the credibility of Hall's testimony with some justification. Hall manifested confusion regarding when events occurred in relation to each other. Hall referred to appellant at various times as Roger, Robert, Mr. Wood, and "what's his name." A homicide detective called by the defense acknowledged that he had expressed doubts about Hall's credibility given his "issues" with alcohol. On the other hand, the most important fact established by Hall's testimony, appellant's ownership of the bloody jeans, was corroborated by evidence showing that the jeans were appellant's size and by the presence of appellant's DNA in the waistband and crotch.

Appellant acknowledges that the DNA evidence shows that he wore the bloody jeans at some time, but he urges that it does not show when he wore them. He points out that the DNA evidence showed that Wessberg had also worn the jeans, and he suggests that some other person may have been wearing the jeans on the night of the murder. As for the presence of Wessberg's blood on his cane, appellant notes that no one testified to seeing him or anyone else strike Wessberg with a cane with the force necessary to cause the injuries described in the medical testimony.

Appellant also faults the State for the scientific testing that was not done. Appellant points to Lindell—a man who matched Reil's description of the possible assailant—and asks why no tests were performed on the apparent blood stains on his jacket and on the material seen on his

knife. Appellant also notes that no testing was performed on the fingernail clippings gathered by the medical examiner during the autopsy of Wessberg's body.

Appellant also discounts the testimony of Vasquez and Perez. He notes that Vasquez could not identify him at trial and that she testified only that his jacket and cane were similar to those she saw that night. Similarly, Perez testified only that appellant's jacket and cane were similar to those he saw. Further, Perez acknowledged at trial that he had initially described the jacket as being blue, when in fact it was green. Appellant also discounts the significance of Reil's recorded statement, noting that his description of the possible perpetrator does not fit appellant.

Appellant urges that no weight should be given to Anthony's testimony given his status as a habitual offender facing a possible life sentence in a pending prosecution. Anthony testified appellant made some of his incriminating statements in the presence of two other inmates, Scott Keller and Juan Perez. Both of these men were called as defense witnesses, and they denied hearing appellant confess to the murder. Keller testified, to the contrary, that he heard appellant claim to be innocent.

Appellant also points to the absence of any evidence confirming Anthony's testimony regarding a "smiley." No such weapon was discovered by the police, and the medical examiner testified that a chain was only one of many objects that could have caused the fatal injuries. Appellant says that he may have discussed the circumstances of his case with Anthony, which would explain Anthony's familiarity with many of the details surrounding the offense, but this does not mean that he confessed his guilt.

Finally, appellant notes that the State offered no evidence that he had engaged in any previous acts of violence. The pastors at the church testified to appellant's peaceful, nonbelligerent behavior.

Although the jury had reason to doubt Hall's credibility, it was nevertheless entitled to believe him, and we must defer to that credibility determination insofar as Hall's testimony was not contradicted by other, more credible evidence. *Goodman*, 66 S.W.3d at 286. It is also true that Anthony was not an inherently credible witness, and some of his testimony was contradicted by defense witnesses. But these defense witnesses were also jail inmates and thus had credibility issues of their own, although they did not have any obvious incentive to testify for the defense. On the basis of the record as a whole, it was not manifestly unjust for the jury to resolve the witness credibility issues in favor of the State.

It is possible to explain away or minimize much of the incriminating evidence: Hall was lying or mistaken in saying that the bloody jeans belonged to appellant; someone else was wearing the jeans on the night of the murder; Vasquez and Perez did not clearly see what was happening at the intersection as they drove through it that night, and they mistakenly identified appellant; the amount of Wessberg's blood on appellant's cane was not consistent with the cane being the murder weapon; Anthony lied about appellant's confession in hopes of currying favor with prosecutors in his own case. But considering the evidence as a whole, there is no exculpatory interpretation of the evidence that is so strong or convincing as to outweigh the inculpatory interpretation chosen by the jury. The State's evidence was not so weak, and the defensive evidence was not so strong, as to render the jury's verdict manifestly unjust. Point of error two is overruled.

11

## CONFRONTATION

Appellant contends that his Sixth Amendment right to confront the witnesses against him was violated by the admission of testimonial hearsay evidence, specifically information contained in the report from the autopsy on Wessberg's body. The medical examiner who conducted the autopsy, Dr. Ruth Colemeyer, did not testify. Instead, the State called the chief medical examiner, Dr. David Dolinak, who had not been present at the autopsy, to testify regarding the examination of the body and to give his opinions regarding Wessberg's injuries and the cause of his death. Appellant contends that he was thereby denied his constitutional right to confront Colemeyer and challenge her findings and conclusions contained in the autopsy report.

In *Crawford v. Washington*, the Supreme Court held that the Sixth Amendment confrontation right applies not only to in-court testimony, but also to out-of-court statements that are testimonial in nature. 541 U.S. 36, 51 (2004). The Confrontation Clause forbids the admission of testimonial hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id*. at 68. Whether a particular out-of-court statement is testimonial is a question of law. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). It was the State's burden, as the proponent of the challenged evidence, to establish its admissibility. *Id*.

A trial court's ruling admitting or excluding evidence is reviewed for an abuse of discretion. *See State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). This means that the ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory. *Id*. The trial court is the sole trier of fact and judge of the credibility of the witnesses

and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give the trial court almost complete deference in determining historical facts, but we review de novo the trial court's application of the law to those facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *see also Wall v. State*, 184 S.W.3d 730, 742-43 (Tex. Crim. App. 2006) (applying hybrid standard of review to *Crawford* issue); *Mason v. State*, 225 S.W.3d 902, 907 (Tex. App.—Dallas 2007, pet. ref'd) (same).

### *Autopsy report was testimonial*

Appellant's point of error is premised on the assertion that Colemeyer's autopsy report was testimonial hearsay under *Crawford*. The State challenges this assertion, citing four Texas court of appeals opinions holding that an autopsy report is not testimonial. *See Campos v. State*, 256 S.W.3d 757, 762 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *Pierce v. State*, 234 S.W.3d 265, 269 (Tex. App.—Waco 2007, pet. ref'd); *Mitchell v. State*, 191 S.W.3d 219, 222 (Tex. App.—San Antonio 2005, pet. ref'd); *Denoso v. State*, 156 S.W.3d 166, 182 (Tex. App.—Corpus Christi 2005, pet. ref'd). However, these opinions were written before the Supreme Court announced its opinion in *Melendez-Diaz v. Massachusetts*, ___ U.S. ___, 174 L.Ed.2d 314 (2009). In *Melendez-Diaz*, the Supreme Court held that reports prepared by analysts at the state crime laboratory stating that a substance was cocaine were testimonial statements, and that the analysts who prepared the reports were witnesses for purposes of the Sixth Amendment. *Id.* at 321-22. Absent a showing that the analysts were unavailable to testify and that the defendant had

13

a prior opportunity to cross-examine them, the defendant was entitled to be confronted with the analysts at trial. *Id*. at 322.

In *Denoso*, the court of appeals held that an autopsy report was nontestimonial because it was not prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and was not a statement given in response to police interrogation. 156 S.W.3d at 182. The opinion in *Melendez-Diaz* makes it clear that the meaning of "testimonial" is broader than the definition used in *Denoso*. The Court expressly rejected the argument that out-of-court statements are testimonial only if they are made in response to interrogation. *Melendez-Diaz*, 174 L.Ed.2d at 325.

In *Campos*, the court of appeals held that an autopsy report was nontestimonial because it contained "sterile recitations" of "objective facts," was "routine, descriptive, and nonanalytical," and "[did] not relate subjective narratives pertaining to [the defendant's] guilt or innocence." 256 S.W.3d at 761-62. In *Melendez-Diaz*, the Court addressed similar arguments and found them to be without merit. The state argued that the laboratory reports were nontestimonial because the analysts were not "accusatory" witnesses, that is, they did not directly accuse the defendant of wrongdoing; rather, their testimony was inculpatory only when taken together with other evidence. *See Melendez-Diaz*, 174 L.Ed.2d. at 323. The Court held, however, that the Sixth Amendment "contemplates two classes of witnesses—those against the defendant and those in his favor. The prosecution *must* produce the former . . . . Contrary to respondent's assertion, there is not a third category of witnesses . . . ." *Id*. The Supreme Court also found unconvincing the argument that the laboratory analysts, because they had "observe[d] neither the crime nor any human action related to it," were not "conventional witnesses" subject to confrontation. *Id*. at 325. The Court

also rejected the argument that, for Confrontation Clause purposes, a distinction should be drawn between testimony recounting historical events and testimony that is the result of "neutral, scientific testing." *Id*. The Court conceded that there may be other and better ways to challenge or verify the results of a forensic test, but "the Constitution guarantees one way: confrontation. We do not have license to suspend the Confrontation Clause when a preferable trial strategy is available." *Id*. at 326.

In *Mitchell*, the court of appeals held that an autopsy report was nontestimonial because it was a public or business record. 191 S.W.3d at 222; *see also Pierce*, 234 S.W.3d at 269 (following *Mitchell*).[4] In *Melendez-Diaz*, however, the Court rejected the contention that public or business records are categorically nontestimonial. "Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. *See* Fed. Rule Evid. 803(6). But that is not the case if the regularly conducted business activity is the production of evidence for use at trial." *Melendez-Diaz*, 174 L.Ed.2d at 328. The Court added, with specific reference to the laboratory reports at issue in that case:

> Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial. Whether or not they qualify as business or official records, the analysts' statements here—prepared specifically for use at petitioner's trial—were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment.

---

[4] In an unpublished opinion predating *Melendez-Diaz*, this Court also suggested, but did not squarely hold, that an autopsy report was nontestimonial because it was a public or business record. *See Terrazas v. State*, No. 03-05-00344-CR, 2006 Tex. App. LEXIS 6696, at *13-15 (Tex. App.—Austin July 28, 2006, pet. ref'd) (mem. op., not designated for publication).

15

*Id*. at 329-30. In the course of rejecting the asserted Confrontation Clause exception for business and public records, the Court wrote that "whatever the status of coroner's reports at common law in England, they were not accorded any special status in American practice." *Id*. at 328.

In Texas, a medical examiner is required by law to conduct an inquest when a person dies under circumstances warranting the suspicion that death was caused by unlawful means. Tex. Code Crim. Proc. Ann. art. 49.25, § 6(4) (West 2006). If the cause of death is determined beyond a reasonable doubt, the medical examiner must file a report stating the cause of death with the district, criminal district, or county attorney. *Id*., § 9(a). An autopsy must be performed if the medical examiner deems it necessary or if the prosecuting attorney requests it, and a report detailing the findings at autopsy must also be filed with the prosecuting attorney. *Id*. Copies of all records kept by the medical examiner must be delivered to the proper district, criminal district, or county attorney in any case where further investigation is advisable. *Id*., § 11.

We do not hold that all autopsy reports are categorically testimonial. In this case, however, the circumstances surrounding Wessberg's death warranted the police in the suspicion that his death was a homicide, and there is evidence that this is exactly what the police did suspect. The homicide detective who was the lead investigator in this case and a police evidence specialist attended the autopsy of Wessberg's body. Under these circumstances, it is reasonable to assume that Colemeyer understood that the report containing her findings and opinions would be used prosecutorially.[5] *See Melendez-Diaz*, 174 L.Ed.2d at 321. We hold that Colemeyer's autopsy report

---

[5] We do not know from the record, but it is likely that Colemeyer concluded that Wessberg's death was a homicide. This conclusion would also lead a medical examiner to anticipate a prosecutorial use of her autopsy report.

16

was a testimonial statement and that Colemeyer was a witness within the meaning of the Confrontation Clause.[6]

### *Dolinak's testimony*

Although we agree with appellant that Colemeyer's autopsy report was testimonial, this does not resolve the issue because the autopsy report was not introduced in evidence. Instead, Dolinak was called to testify to his own opinions regarding Wessberg's injuries and death, and the contents of the autopsy report were used by Dolinak to show the basis for his opinions.

After Dolinak introduced himself to the jury and briefly summarized his education and experience, he was asked by the prosecutor if he had reviewed the autopsy report prepared by Colemeyer and the accompanying photographs. Dolinak said that he had. At this point, appellant objected and the trial court ruled as follows:

> [Defense counsel:] I'm going to first object to this doctor's testimony because he is not the individual that performed the autopsy. And I understand he's qualified, and I understand he's custodian of record, but we're denied our confrontation of having the pathologist who actually conducted the autopsy in order to confront that doctor with the conclusions contained in the autopsy.
>
> THE COURT: I don't think he's going to give those opinions. He's going to give his own opinions.
>
> [Prosecutor:] Uh-huh.
>
> THE COURT: Is how you get around it, is my understanding. He's not going to give somebody else's, it's his opinion.

---

[6] *See Long v. State*, No. 11-07-00319-CR, 2009 Tex. App. LEXIS 6577, at *4-5 (Tex. App.—Eastland Aug. 20, 2009, no pet. h.) (mem. op., not designated for publication) (citing *Melendez-Diaz* and holding that toxicology report prepared during autopsy was testimonial and that admission of report without calling technician who performed it violated Confrontation Clause).

17

[Prosecutor:] Based on what he's reviewed.

THE COURT: Okay.

Without further objection at that time, the prosecutor then resumed her questioning.[7]  She turned almost immediately to the contents of Colemeyer's report:

Q.  . . . [W]hat's recorded in the report specifically with respect to head injuries?

A.  He had a hemorrhage around his right eye, and had abrasions or scrapes on his face, different areas of his face.  He had marks that were in kind of almost like a stop-sign-shaped pattern, two of those on the right side of his head.  Those were a type of scrape from an object.

And he had bruising, mainly in the back of the head.  There were multiple bruises, and there was also a about a quarter-inch tear in the scalp, what we call a laceration.  Again, that's from impact with some type of an object.

. . .

Q.  Okay.  I'm going to direct your attention to the report and the chest injuries listed in the report.  What types of injuries did the defendant [sic] sustain to his chest?

A.  He had a lot of rib fractures.

Q.  How many rib fractures did the victim have?

A.  He had a total of 21 rib fractures.

Q.  Okay.  And what else, what other injuries did he have in his chest?

---

[7] Appellant later objected that the photographs of Wessberg's body were gruesome. *See* Tex. R. Evid. 403.  Appellant also objected to Dolinak's opinion that some of the injuries shown in the photographs could have been inflicted with the broken umbrella on the ground that Dolinak had not physically examined the body.  Both of these objections were overruled.

18

A. He had bleeding in the right side of his chest around his right lung, and that was about a cup and a half of blood that he had bled internally.

. . .

Q. And was the victim's head opened?

A. Yes.

Q. And what is the purpose of that?

A. To look for any injury like skull fracture or bleeding on the brain, and to see what condition the brain is in.

Q. And was that done in this case?

A. Yes.

Q. And what did that examination reveal?

A. That there's no skull fracture, no bleeding on the brain. He had a little bit of shrinkage of the brain that we see with aging, but that's about it.

. . .

Q. During the autopsy that was performed on George Wessberg, was there any evidence of any disease or defect that resulted in his death?

A. No.

Dolinak also testified to Wessberg's height and weight as measured at the autopsy, and to the results of the toxicology tests of his body fluids.

During his testimony, Dolinak referred to fifteen photographs of Wessberg's body taken during the autopsy and shown to the jury. Two of the photographs show Wessberg's body as it arrived at the medical examiner's office, before his clothes had been removed. The remaining photographs show Wessberg's naked body after it had been washed. All of the photographs are

19

external.  Wessberg's head had been partially shaved in five of the photographs, but otherwise the exhibits do not depict the effects of the autopsy process.  Using these photographs, Dolinak showed the jury the various external injuries found on Wessberg's body, including the bleeding around his eye, the scrapes on his face, the cuts on his scalp, and the bruises on his head, trunk, arms, and legs.  The dislocation of Wessberg's elbow can also be seen in some of the photographs.  Dolinak testified that based on their shape, some of the cuts on Wessberg's scalp appeared to have been made by the broken umbrella found near the body.  Dolinak also testified that the injuries to Wessberg's arms and hands might have been defensive, and that the bruises on Wessberg's legs could have been made by the tip of a cane.

Dolinak's direct examination concluded with the prosecutor asking him, "[B]ased on the autopsy and the condition of the body at the time it was discovered, do you have an opinion, first of all, as to the cause of death of Mr. Wessberg?"  Dolinak replied that Wessberg died from blunt force trauma to his chest, head, and extremities.  Dolinak answered affirmatively when asked if Wessberg's rib fractures could have been caused by "a padlock that's on ten lengths of logging chain and it's swung around the victim."  Dolinak then briefly described the effects of blunt force trauma and estimated that Wessberg's injuries would have resulted in death in thirty minutes to two hours.

### Evidence rules 703 and 705

Although neither the prosecutor nor the trial court expressly cited evidence rules 703 and 705, it is apparent from what was said that these rules were the basis on which Dolinak's testimony was offered and admitted.  Under rule 703, an expert witness may base an opinion on facts or data that are not admissible in evidence, provided that the inadmissible facts or data are of a type

reasonably relied on by experts in the particular field.  Tex. R. Evid. 703.  Under this rule, an expert may base an opinion solely on inadmissible hearsay.  *Martinez v. State*, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000); *Aguilar v. State*, 887 S.W.2d 27, 29 & n.8 (Tex. Crim. App. 1994); *see also* 2 Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence* § 703.3 (3d ed. 2002 & Supp. 2009) (hereafter "Goode").[8]  Under rule 705, an expert witness may generally disclose on direct examination the facts or data underlying his opinion.  Tex. R. Evid. 705(a).  Under certain limited circumstances, an expert witness may disclose the facts and data underlying his opinion even if they are inadmissible as evidence.  Tex. R. Evid. 705(d); *see* Goode, § 705.3.

Appellant correctly observes that evidence rules cannot trump the Sixth Amendment. *See Crawford*, 541 U.S. at 61 ("[W]e do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence. . . .").  In *Melendez-Diaz*, the Supreme Court wrote that confrontation "is one means of assuring accurate forensic analysis" and "is designed to weed out not only the fraudulent analyst, but the incompetent one as well."  174 L.Ed.2d at 326.  Appellant argues that his constitutional right of confrontation was violated because Dolinak was permitted to base his opinion testimony on Colemeyer's inadmissible autopsy report and to disclose the contents of that inadmissible autopsy report, but appellant was denied the

---

[8] In *Galvan v. State*, cited by appellant, this Court wrote that "[a]n expert's opinion may not be based on statements or reports of third persons unless the statements are properly in evidence." 699 S.W.2d 663, 669 (Tex. App.—Austin 1985, pet. ref'd).  *Galvan*, however, was decided before what is now rule 703 was adopted for criminal cases.

opportunity to confront and cross-examine Colemeyer in order to test her competence and the accuracy of her findings.[9]

In *Blaylock v. State*, a chemist was permitted to give his opinion at trial that a suspect substance was cocaine even though he had not been the person who conducted the laboratory tests on the substance. 259 S.W.3d 202, 205 (Tex. App.—Texarkana 2008, pet. ref'd). Instead, the expert witness based his opinion on the report prepared by the chemist who had conducted the tests. *Id*. The defendant urged that this violated his constitutional confrontation right because he was unable to cross-examine the chemist who actually tested the substance. *Id*. at 207. The court of appeals, noting that the testifying expert had affirmed the reliability of the test data on which he based his opinion, held that the Confrontation Clause was not violated. *Id*. at 207-08. Because the testifying chemist was subject to cross-examination, and because his testimony was based on the application of "his expertise to reliable scientific test data," the Confrontation Clause was satisfied. *Id*. at 208.

*Blaylock* was decided before the Supreme Court announced its opinion in *Melendez-Diaz*, and we do not necessarily endorse all of its reasoning. We agree, however, that the Confrontation Clause is not violated merely because an expert bases an opinion on inadmissible testimonial hearsay. The testifying expert's opinion is not hearsay, and the testifying expert is available for cross-examination regarding his opinion. *Aguilar*, 887 S.W.2d at 29; *Blaylock*,

---

[9] The State argues that appellant did not preserve these contentions for review because, at the time he objected, no testimonial hearsay testimony had been offered. It was obvious when the objection was made, however, that the State intended to have Dolinak testify on the basis of his review of Colemeyer's report. This was clearly the trial court's understanding of the State's intent, and this understanding was confirmed by the prosecutor after appellant's objection was made. Appellant's contentions were preserved for appeal.

259 S.W.3d at 206. The Confrontation Clause does not prohibit *any* use of testimonial hearsay; it only prohibits the use of testimonial hearsay to prove the truth of the matter asserted. *See Crawford*, 541 U.S. at 59, n.9. When an expert bases an opinion on testimonial hearsay but does not disclose the testimonial hearsay on which that opinion is based, the jury hears only the expert's direct, in-court testimony. We hold that the Confrontation Clause was not offended when Dolinak testified to his own opinions regarding the nature and causes of Wessberg's injuries and death, even though those opinions were based in part on Dolinak's review of Colemeyer's autopsy report.

But Dolinak did more than merely offer his expert opinions. He also disclosed to the jury the testimonial statements in the autopsy report on which his opinions were based. Rule 705(d) permits an expert to disclose inadmissible facts or data underlying his opinion, but only if their value as explanation and support for the opinion is not outweighed by the danger that the facts and data will be used for another, impermissible purpose. "One of the greatest dangers in allowing otherwise inadmissible evidence under Rule 705 is that the jury will consider the facts and data as substantive evidence rather than as merely constituting the underlying basis for the expert's opinion." *Valle v. State*, 109 S.W.3d 500, 505-06 (Tex. Crim. App. 2003) (quoting *Cole v. State*, 839 S.W.2d 798, 815 (Tex. Crim. App. 1992) (Maloney, J., concurring on reh'g)). This is precisely the situation presented in this case, because the facts and data in Colemeyer's autopsy report explained and supported Dolinak's opinions only if they were true. Appellant did not request a limiting instruction, but even if the trial court had expressly instructed the jury to consider the testimonial statements in the autopsy report for the limited purpose of explaining and supporting Dolinak's opinions, the jury could not have given effect to that instruction without first determining that the statements were true.

23

Under the circumstances of this case, the disclosure of the out-of-court testimonial statements underlying Dolinak's opinions, even if only for the ostensible purpose of explaining and supporting those opinions, constituted the use of the testimonial statements to prove the truth of the matters stated in violation of the Confrontation Clause.

Our conclusion is consistent with the holding in *Hernandez v. State*, 273 S.W.3d 685, 688-89 (Tex. Crim. App. 2008). In that case, Hernandez and two other persons were accused of capital murder. *Id*. at 686. During custodial police interrogation, one of the other suspects, Leffew, gave a statement minimizing her role in the affair and placing most of the blame on the defendant. *Id*. At Hernandez's trial, the defense called two jail inmates to testify that Leffew had confessed her own guilt to them and told them that Hernandez took part in the murder only because Leffew threatened to injure Hernandez's children. *Id*. at 687. Thereafter, the State was permitted to introduce portions of Leffew's custodial statement to the police for the limited purpose of impeaching the defensive testimony. *Id*. at 688-89. The court of criminal appeals held that even though Leffew's statement to the police was testimonial, the Confrontation Clause was not violated because the statement was not used to prove the truth of the matters stated. *Id*. at 689. As the court explained:

> [T]he jury could have given effect to Leffew's statement to [the police] by more than one means than taking the content for its truth. The theory of attack by prior inconsistent statements is not based on the assumption that the present testimony is false and the former statement true but rather upon the notion that talking one way on the stand and another way previously is blowing hot and cold, and raises a doubt

24

as to the truthfulness of both statements. The jury could have decided that Leffew's inconsistent statements demonstrated that she was not a credible witness, and therefore that neither of her statements could be believed.

*Id*. (quotation marks and footnote omitted).

The Confrontation Clause was not violated in *Hernandez* because the jury could consider the out-of-court testimonial statement as impeachment without assuming that the statement was true. The Confrontation Clause was violated in appellant's case because the jury could not consider the testimonial statements in the autopsy report as supporting or explaining Dolinak's opinions without assuming that the statements were true.

### Error was harmless

Because there was constitutional error, we must reverse appellant's conviction unless we are satisfied beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex. R. App. P. 44.2(a). Appellant contends that Dolinak's testimony contributed to his conviction in two ways. First, he asserts that without Dolinak's testimony, there was no direct evidence that Wessberg was murdered. Second, by testifying that Wessberg's injuries could have been caused by a person swinging a chain and padlock, Dolinak added credibility to Anthony's testimony describing appellant's jailhouse confession.

Neither of appellant's arguments is persuasive, because neither argument is based on the Confrontation Clause violation in this case. Dolinak's testimony that in his opinion Wessberg's death was a homicide, that he died as a result of blunt force trauma, and that the injuries could have been caused by a chain did not violate appellant's confrontation right. The constitutional error was

25

Dolinak's disclosure of the underlying information contained in Colemeyer's testimonial autopsy report.

The bulk of Dolinak's testimony was devoted to describing and explaining what was shown in the photographs taken during the autopsy. A photograph is not an out-of-court statement. *See* Tex. R. Evid. 801(a). There was no question that the photographs accurately depicted the appearance of Wessberg's body.[10] *See* Tex. R. Evid. 901(a). The admission in evidence of the photographs, Dolinak's descriptions of the injuries shown in the photographs, and Dolinak's conclusions as to likely causes of those injuries did not disclose to the jury any testimonial hearsay and thus did not violate the Confrontation Clause.

The only out-of-court testimonial statements disclosed by Dolinak consisted of Colemeyer's description of the external injuries to Wessberg's head and face, her finding after opening Wessberg's chest that he had twenty-one rib fractures and had bled internally, her findings during the internal examination of Wessberg's skull, and her finding that there was no evidence of disease. In addition, Dolinak's testimony describing Wessberg's height and weight was obviously taken from Colemeyer's report, as was his testimony describing the results of the toxicology tests. In determining whether the disclosure of these testimonial statements constituted reversible error, we must consider how important the statements were to the State's case, whether the statements were cumulative of other evidence, the presence or absence of evidence corroborating or contradicting the

---

[10] Had the question been raised, two witnesses who attended the autopsy, the homicide detective and the evidence technician, could have stated whether or not the photographs were accurate.

26

out-of-court statements on material points, and the overall strength of the prosecution's case. *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007).

Colemeyer's description of Wessberg's external injuries was cumulative of and added nothing to Dolinak's own testimony based on the photographs. Colemeyer found nothing remarkable, much less incriminating, inside Wessberg's skull. Similarly, the absence of any evidence of disease was not an incriminating fact. Neither of those statements was important to the State's case. Wessberg's size was also of no significance to the State's case, and the toxicology result, which showed that Wessberg was intoxicated, was potentially exculpatory insofar as it suggested that Wessberg might have died as the result of an accident. We are satisfied beyond a reasonable doubt that the disclosure of this information taken from the autopsy report did not contribute to appellant's conviction or punishment. Tex. R. App. P. 44.2(a).

The only testimonial hearsay disclosed to the jury that was of any value to the State's case was Colemeyer's statement that Wessberg had suffered twenty-one rib fractures. This evidence made plain the severity of the beating Wessberg suffered at his assailant's hand. The prosecutors apparently believed that this fact was significant because both of them, during final arguments, reminded the jurors of it.[11] But the jury knew that Wessberg had been beaten to death, and the severity of the beating was apparent in the photographs of Wessberg's body, which show that he was covered with bruises and abrasions from head to toe. Some of Wessberg's injuries are also shown in the video recording of the crime scene. The fact that Wessberg had twenty-one rib fractures was

---

[11] This argument was inconsistent with the use of the autopsy report data simply to support Dolinak's expert opinions.

a detail that may have added some weight to the State's case, but it was hardly critical. Considering the factors listed in *Scott*, we are satisfied beyond a reasonable doubt that the disclosure of this testimonial statement did not contribute to appellant's conviction. For the same reasons, we are satisfied beyond a reasonable doubt that the error did not contribute to the trial court's punishment decision.

The autopsy report in question was a testimonial statement and the medical examiner who conducted the autopsy and prepared the report was a witness within the meaning of the Confrontation Clause as construed in *Crawford* and *Melendez-Diaz*. Under the circumstances of this case, the use before the jury of the contents of the autopsy report violated appellant's right of confrontation. Beyond a reasonable doubt, however, the error did not contribute to appellant's conviction or punishment. Point of error three is overruled.

## LESSER INCLUDED OFFENSE

Appellant contends that the trial court erred by refusing to authorize his conviction for the lesser included offense of misdemeanor assault. A defendant is entitled to a jury instruction on a lesser offense if (1) the offense is included within the proof necessary to establish the greater offense for which he is on trial, and (2) there is evidence that would permit the jury to rationally find that the defendant is guilty of the lesser offense but not the greater offense. *Hampton v. State*, 165 S.W.3d 691, 693-94 (Tex. Crim. App. 2005); *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993).

The indictment alleged that appellant caused Wessberg's death "by striking him about his head and body with his hand and an object unknown to the Grand Jury." Bodily injury assault

28

is included within the alleged offense because it is established by proof of the same or less than all the facts required to establish the commission of the alleged offense and because it differs from the alleged offense only in the respect that a less serious injury to the same person suffices to establish its commission. *See* Tex. Code Crim. Proc. Ann. art. 37.09(1), (2) (West 2006); Tex. Penal Code Ann. § 22.01(a)(1) (West Supp. 2008). But there must be some evidence directly germane to the lesser included offense before an instruction on that offense is warranted. *Hampton v. State*, 109 S.W.3d 437, 440 (Tex. Crim. App. 2003). That means in this case that there must be some evidence that appellant struck Wessberg as alleged, but that Wessberg did not die as a result. There is no such evidence. If the jury believed that Wessberg was fatally assaulted by someone other than appellant, the only rational result was to find appellant not guilty. Point of error four is overruled.

The judgment of conviction is affirmed.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: October 7, 2009

Publish