

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00028-CR

TIMOTHY KEITH MCAFEE                                      APPELLANT

V.

THE STATE OF TEXAS                                             STATE

----------

## FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1411449D

----------

## MEMORANDUM OPINION[1]

----------

In a single issue, Appellant Timothy Keith McAfee appeals his conviction for theft of property with a value between $1,500 and $20,000. Tex. Penal Code Ann. § 31.03(a) (West Supp. 2016). We affirm.

---
[1]*See* Tex. R. App. P. 47.4.

**Background**

On April 21, 2015, the Fort Worth Police Department (FWPD) set up a "bait car"[2] in front of a game room in the 3000 block of Lackland Road. The area had a history of vehicle theft, and Officer Jarod Briles and Detective Joel Harter were part of a team investigating the thefts. At 8:55 p.m., Officer Briles parked the bait car in front of the game room with various items of property inside, including a laptop, a purse, and a PlayStation which were in plain view. Some of these items were also equipped with GPS tracking devices. He then left the car, with the front windows rolled down and engine running, joined Detective Harter and another FWPD officer, drove to another part of town, and began remotely monitoring the bait car through a GPS tracking website. Using their cell phones and a computer, the officers would receive email and text message alerts if the door to the car was opened, the ignition was turned on or off, or the car was moved out of a predesignated area.

At 9:59 p.m., the officers received an alert that the door to the bait car had been opened and the engine had been turned off. At 11:35 p.m. they received a

_____

[2]Officer Briles explained that a bait car is "a vehicle that is equipped with GPS cellular tracking, an on-and-off switch that can be remotely triggered through a website that's linked to the car through cellular antenna and video surveillance cameras." Detective Harter, who testified that he started the bait car program with FWPD, added that the cars have "micro cameras that are strategically placed throughout the vehicle [at] different angles to show different areas of the vehicle and outside the vehicle." Essentially, the bait car is equipped so that the officers can track the car, record what is happening inside of the car, and disable the engine remotely, if necessary.

second alert that the door had been opened and the bait car's engine had been restarted. Shortly after that, the bait car began to move and, using the GPS tracking program, the officers quickly located the bait car at Parkside Apartments, about two or three blocks away from the location where it had been left. Officer Briles and Detective Harter testified that when they arrived at the vehicle, Patricia Germany and Gregory Mann were walking away from the car carrying property that the police had placed in the bait car. Appellant was also near the vehicle. Officer Briles testified that Appellant was kneeling in the driver's side door area, but Detective Harter testified that Appellant was walking away from the vehicle. All three individuals were detained for questioning.

Detective Harter removed an SD card from the bait car's cameras and reviewed the video[3] recordings while the other officers spoke to Germany, Mann, and Appellant. Excerpts of the video were admitted into evidence at trial and shown to the jury. The video revealed Germany opening the door to the bait car, turning off the engine, removing the keys from the ignition, and taking them with her.

Later in the video recording, a man dressed in a hooded sweatshirt—later identified as Appellant—approached the bait car, looked inside, opened the rear driver's side door, and placed a backpack on the rear seat. Before opening the driver's door, Appellant pulled the hood of his sweatshirt over his head and

_____

[3]The video recordings were stored on an SD card that Detective Harter took out of the bait car and viewed on his computer.

3

adjusted the sleeves of his sweatshirt so that they covered his hands. He then entered the bait car and seated himself in the driver's seat. A female voice can be heard on the video saying, "Ok, follow me then."

While he turned the key to start the vehicle and put his seatbelt on, Appellant's hoodie kept sliding off of his hands, and he repeatedly adjusted his sleeves to keep them covered. The hood of Appellant's sweatshirt also slid off of his head, so he adjusted the baseball cap he was wearing and pulled it over his eyes. Appellant backed the bait car out of the parking spot it was in, and as he was driving away, he seemed to become irritated with another driver, saying "Come on, man" and honking. Appellant then drove the bait car away from the game room parking lot.

When he arrived at the apartments, Appellant backed the bait car into a parking spot. At that point the video showed Germany opening the front passenger side door, and Appellant saying, "We're gonna put all the sh** back there." Germany responded, "Stop, stop, wait—put it all back!" Then a third, male voice uttered something although his exact words are difficult to ascertain. The video showed Germany removing property from the inside of the car, and Appellant at one point saying, "I better get something for my mental anguish, dude." Appellant also expressed his interest in a pair of Jordan tennis shoes that were in the bait car.

At that point, Appellant asked Germany whose car it was, and when Germany directed Appellant to "kill it," Appellant replied, "God d*mm**, woman!

4

What kind of sh** did you get me into?" After Germany removed the property from the inside of the car, she and Appellant tried to determine how to get into the trunk of the vehicle.[4] In the video recording, Germany is heard saying, "Pop the trunk!," and Appellant looks throughout the front area of the car, the glove compartment, and even in the back seat of the car for the trunk release. Germany and Appellant appear to grow more and more frustrated as they cannot find the trunk release or otherwise figure out how to open the trunk.

The video also showed that when the police arrived, Appellant attempted to defend his activities that evening by explaining, "I was just trying to get the car back to the Christian man."

After reviewing the video and interviewing Appellant, Germany, and Mann, Detective Harter arrested Appellant and Germany.[5] Appellant was charged with theft of property with a value between $1,500 and $20,000, with a state jail felony enhancement alleging that Appellant had been previously convicted of failing to comply with sexual offender registration requirements. The jury found Appellant guilty of theft and found the enhancement paragraph of the indictment true. Appellant was sentenced to four years' imprisonment.

---

[4]Detective Harter testified that the trunk on the bait car was inaccessible and that the FWPD had a separate key to access the trunk, where equipment was stored.

[5]Detective Harter testified that because he did not have any video of Mann "at either the recovery location or the offense location," he felt he did not have sufficient evidence to arrest Mann.

**Discussion**

In a single issue, Appellant argues that the evidence was not sufficient to establish that he intended to deprive the owner of the vehicle because "the only evidence presented by the State was the mere presence of the Appellant at the scene of the crime while driving the vehicle."

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the

verdict. *Murray*, 457 S.W.3d at 448. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014); *see Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Thomas*, 444 S.W.3d at 8. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

"A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code Ann. § 31.03(a).

7

Appropriation of property is unlawful if it is without the owner's effective consent or the property is stolen and the actor appropriates the property knowing it was stolen by another. *Id.* § 31.03(b)(1), (2).

Appellant argues that there was no evidence that he was aware that the vehicle was stolen and that the "mere presence alone of a defendant at the scene of a crime is insufficient," relying upon *Golden v. State*, 851 S.W.2d 291, 294 (Tex. Crim. App. 1993). But *Golden* is distinguishable from the case at hand; the issue in *Golden* was whether a proper jury instruction was given informing the jury "that the mere presence of the appellant was insufficient to corroborate the testimony of the accomplice witness." *Id.* at 294–95. There is no accomplice testimony at issue in this case.

It is well-established that intent may be inferred from circumstantial evidence such as acts, words, and the appellant's conduct. *Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) (citing *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)). Circumstantial evidence is as probative as direct evidence in establishing guilt. *Dobbs*, 434 S.W.3d at 170; *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, as with any other type of evidence, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991); *see*

8

*also Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009) (confirming that circumstantial evidence of intent is reviewed as stringently as any other type of evidence).

Appellant does not dispute that he took the car and that he did so without the owner's consent. The court of criminal appeals has noted that, "[w]hile unlawful appropriation of property does not alone prove intent to deprive the owner of the property, it could be construed by the trier of fact to constitute circumstantial evidence of intent to deprive." *Rowland v. State*, 744 S.W.2d 610, 613 (Tex. Crim. App. 1988). His act of taking the car without the consent of its owner therefore could have been considered by the jury as evidence of his intent to deprive.

Additionally, while the record may provide no direct evidence establishing that Appellant knew the car was stolen, the video surveillance recording provides circumstantial evidence of his knowledge. The redundancy of Appellant's placement of the hood of his sweatshirt over his baseball cap suggests that he was attempting to conceal or obscure his identity. And Texas courts have recognized that it is reasonable for a jury to infer a defendant's intent to commit theft based on his attempts to conceal or obscure his identity. *See, e.g.*, *Matthews v. State*, Nos. 13-12-00051-CR, 13-12-00052-CR, 13-12-00056-CR, 2013 WL 3894005, at *17 (Tex. App.—Corpus Christi July 25, 2013, pet. ref'd) (mem. op., not designated for publication) (noting that appellants' act of bringing "masks and/or hoodies . . . and rubber gloves" to drug deal showed an intent to

9

commit robbery); *Slomba v. State*, 997 S.W.2d 781, 783 (Tex. App.—Texarkana 1999, pet. ref'd) (holding that it was reasonable to infer the defendant's intent to commit theft based on his being "dressed almost entirely in a black disguise and hiding behind a dumpster" while waiting for a bank worker to unlock rear door of bank).

Likewise, Appellant's curious use of his sleeves to cover his hands while he was touching the interior of the vehicle strongly suggests that Appellant was attempting to avoid leaving fingerprints or DNA on the surface of the vehicle. This behavior also provided a reasonable basis for the jury to infer that Appellant was aware of the nature of his conduct. *See, e.g., Davis v. State*, 772 S.W.2d 563, 566 (Tex. App.—Waco 1989, no pet.) (noting that there was evidence that the defendant had used socks to cover his hands to obscure fingerprints that could have been considered by the jury in determining there was an intent to commit theft), *overruled on other grounds by Williams v. State*, 815 S.W.2d 743 (Tex. Crim. App. 1991); *Knoll v. State*, No. 13-14-00305-CR, 2015 WL 4504782, at *3 (Tex. App.—Corpus Christi July 23, 2015, no pet.) (mem. op., not designated for publication) (noting that the jury heard testimony that the defendant "acted in a suspicious manner" in removing price tags from merchandise and placing it into shopping bags before walking out of the store without paying for the merchandise).

At trial, Detective Harter also described Appellant as being in a "hurried state" and in a "kind of panic mode" as he drove the vehicle from the parking lot

10

of the game room, behavior that is also observable on the video recordings. This sort of anxious behavior has been held to support a finding that a defendant knew he was committing a crime. *See, e.g.*, *Wood v. State*, 299 S.W.3d 200, 205 (Tex. App.—Austin 2009, pet. ref'd) (considering evidence of defendant's anxious and panicky behavior on the night of the murder in holding evidence was sufficient to support conviction).

The jury also heard Appellant's comment to Germany that he wanted "something for [his] mental anguish" and his question to her, "What kind of sh** did you get me into?" While Appellant argues that these statements evidence his lack of knowledge that the car was stolen, and, at best, could only be used to show that he committed theft of the items "*within* the car, but *not* the car itself," we disagree. While these statements may give rise to more than one inference, the inferences to be drawn from Appellant's comment and inquiry were for the jury to resolve. *Matson*, 819 S.W.2d at 846.

Furthermore, although Appellant claimed to the officers that he was going to return the car to the "Christian man," the jury could have weighed the credibility of this statement in light of the fact that the vehicle was a bait car, not a vehicle borrowed or belonging to some unnamed "Christian man." The nonexistence of any demonstrable attempt by Appellant to return the vehicle and its contents to anyone could also have been taken into account by the jury to determine that he intended to steal the car. *See Rowland*, 744 S.W.2d at 613 (noting that defendant's failure to contact truck owner to explain why he had not

11

returned truck as promised was evidence of his intent to deprive the owner of the truck). It was the jury's role to determine any conflicting inferences that could be made from such evidence or lack thereof. *Matson*, 819 S.W.2d at 846. Where there is evidence to support the jury's finding, we must defer to the jury's resolution of any conflicts presented by the evidence. *Id.* at 846.

We conclude that the cumulative force of the evidence was sufficient to lead a rational trier of fact to find that Appellant possessed the requisite intent to commit theft. We therefore overrule Appellant's sole issue.

## Conclusion

Having overruled Appellant's sole issue, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and SUDDERTH, JJ.

DAUPHINOT, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 25, 2016