**AFFIRM; and Opinion Filed July 14, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00630-CR

### JOSE GONZALEZ, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F-11-60352-I**

## OPINION

Before Justices Fillmore, Evans, and Lewis
Opinion by Justice Fillmore

A jury convicted Jose Gonzalez of murder and, following Gonzalez's plea of true, found the enhancement paragraph alleged in the indictment to be true and assessed punishment of twenty-five years' imprisonment. In four issues, Gonzalez asserts the evidence is insufficient to support the conviction and the jury's rejection of his claim of self-defense; the trial court's admission of evidence from a medical examiner who reviewed, but did not conduct the autopsy, violated his right to confront the witnesses against him; the State's failure to disclose exculpatory evidence violated his right to due process and a fair trial; and the trial court submitted an erroneous jury charge in the guilt phase of the trial. We affirm the trial court's judgment.

### Background

Jarell Parker (Parker), who was eighteen years old, and Ladaidren Dotson (Dion), who was sixteen years old, sold marijuana and Xanax from a house at 1406 Marfa (the house).

Because of a previous robbery at the house, Dion had installed cameras to monitor who was outside the house. Further, the back door to the house was barricaded with a piece of wood and could not be used to enter or leave the house. Dion also kept two handguns, a .45 caliber Smith & Wesson semi-automatic and a P89 Ruger, in the house.

Dion and his uncle, Jimmy Giddings, were members of the Trey Overton Bloods, a gang. Gonzalez had been a member of the gang before he was sentenced to five years' imprisonment for selling drugs. Sometime around September 14, 2011, Giddings and Gonzalez had a fight. Gonzalez testified the fight was due to comments Giddings was making about Gonzalez's desire to no longer be in the gang. Gonzalez admitted he hit Giddings first and then Giddings hit him twice.

After the fight, Giddings, Dion, Roddie Dodd, and another man went to Gonzalez's parents' house to continue the fight. According to Gonzalez, Dion had a gun, and Giddings instructed Dion to shoot Gonzalez if he got close. Gonzalez's sister called the police, and the men left before the police arrived. Dion admitted going to Gonzalez's parents' house with Giddings, but denied having a gun. According to Dion and Gonzalez, Giddings and Gonzalez subsequently shook hands and "made up." Dion also testified, however, that this did not necessarily mean the issues between Giddings and Gonzalez had been resolved.

On September 26, 2011, Antwanette Dotson, Dion's mother, was sitting in her grandmother's yard on the "next street" from the house. Around 1:30 p.m., Antwanette saw Gonzalez, whose nickname is Pelon, driving around the neighborhood in a black Suburban. Gonzalez's nephew, Sergio Gonzalez, whose nickname is Ching Ching, was in the car with Gonzalez. Sergio had once stolen money from Giddings by taking the money from his pocket while he was asleep. According to Antwanette, Gonzalez's brother was in another vehicle

following Gonzalez and Sergio. The way the men kept circling the neighborhood and looking at her made Antwanette suspicious.

Between 2:00 and 3:00 p.m., Dion gave the .45 caliber Smith & Wesson handgun to Parker and left the house with LaPorshya Polley to buy some food. Dion testified the P89 Ruger was tucked into the cushions of the couch, and there were two boxes containing approximately twenty "sacks" of marijuana by the couch. When Dion and Polley left the house, Parker was standing on the front porch with the .45 caliber handgun in his hand and there was nobody else in the house. A silver Cadillac belonging to Giddings was parked in the driveway of the house. Dion testified that, if his uncle's car was there, people in the neighborhood would expect Giddings to be somewhere nearby.

Victor King, who admitted he was a convicted felon and who Gonzalez described as a "crack head," went to the house between 3:00 and 3:30 p.m. to try to get some "dubies," which are the ends that are left after a marijuana cigarette is smoked. Parker was alone in the house, but told King that Dion had gone to buy them something to eat. King asked if he could get the "dubies" out of the ashtrays, and he and Parker walked through the house looking for "dubies." King did not see anybody else in the house.

As King was getting ready to leave the house, a black car pulled into the yard and blocked the camera. A few minutes later, somebody knocked on the door. Parker asked who it was, and the man said, "It's Pelon, open the door, bitch." Parker opened the door, and Gonzalez said, "Sell me a sack, bitch." According to King, who knew Gonzalez, Gonzalez's tone was aggressive but, in King's experience, Gonzalez's tone was always aggressive. Gonzalez entered the house as King left.

King saw Gonzalez's Suburban parked across the yard with Sergio in the front passenger seat. Polley's car was parked next to Gonzalez's Suburban. Dion was in the passenger seat of

Polley's car and was talking to Sergio. King had a brief conversation with Dion and Sergio. As King walked away, he heard three gunshots from inside the house. King was walking "fast" along a "pretty busy" street when Gonzalez, who was driving the Suburban, stopped beside him. Gonzalez said to King, "You didn't see nothing." King told Gonzalez that he did not have "nothing to do with it." Gonzalez then said, "bitch, I said you didn't see nothing." King took Gonzalez's statements as a threat.

Dion and Polley both testified they were away from the house for no more than fifteen or twenty minutes. Dion testified that, when he and Polley returned to the house, they saw the Suburban parked across the yard and he saw Gonzalez going into the house. Sergio was sitting in the passenger seat of the Suburban. Dion and Sergio discussed whether Sergio had any Xanax pills to sell to Dion. The conversation came to an end when Dion and Polley heard gunshots from inside the house. According to Dion, the door to the house was cracked open and he saw a flash from the door, making him think the shots were by the door. Dion heard two shots "doubled up" and another shot by itself. Dion could tell the shots came from more than one gun and that one of the guns was more powerful than the other gun. Sergio seemed surprised by the shots and jumped out of the Suburban with a gun in his hand. Dion started to get out of the car, but Polley pulled him back into the car and drove down the street. Polley heard only two gunshots, one while she and Dion were at the house and one while she drove away.

As Polley drove away, Dion watched the house in the car's rearview mirror. Dion saw Gonzalez run out of the house with something in his hand. Polley stopped three or four houses away from the house, and Dion got out of the car. Dion ran into his neighbor's house, and then Dion, followed by the neighbors, ran back to the house. Dion went into the house and saw Parker's body lying on the floor by the couch. Parker had been shot in the head.

–4–

Roddie Dodd lives across the street from the house. Around 2:30 or 3:00 p.m., Dodd heard Dion yelling. Dodd went into the house and saw Parker's body. According to Dodd, Parker's hand was shaking and he did not see any blood. When Dodd picked up Parker, blood just "spilled out" of the wound on Parker's head. Dodd stayed with Parker's body until the police arrived.

According to Dion, he called 9-1-1 immediately after finding Parker's body. However, the 9-1-1 records indicated a call was not received until 4:24 p.m. Detective Steven David, who was assigned to the Dallas Police Department's Homicide Unit, testified that, if there was a gap between the shooting and the 9-1-1 call, there would have been an opportunity for someone to remove any guns, money, and drugs from the house before the police arrived. Dion admitted he entered the house intending to remove his guns, but testified both the guns and the marijuana were gone. According to Dion, only Gonzalez had the opportunity to take these items. Dion admitted, however, that if Gonzalez did not take the items, he, Dodd, and two other people who entered the house before the police arrived had the opportunity to remove the items. Dion also admitted that, after a murder at another drug house, one of his uncles took the money, drugs, and guns out of the drug house and turned out the pockets of the victim's pants.

Detective Roosevelt Holiday, with the Dallas Police Department's Crime Scene Unit, was responsible for processing the crime scene. Holiday saw Parker's body next to the couch "with a bullet defect to the head." The pockets of Parker's pants were turned out. Parker's hand was directly over a shoe box, suggesting to Holiday that Parker may have handled the box shortly before he was shot. There were no weapons in the house. Holiday saw two bags of a green leafy substance on the floor next to Parker's body. Holiday also saw some pills and an unfired bullet in the house.

Holiday saw a fired .45 caliber cartridge case in the hallway of the house "sort of close to the body." Although Dion testified there was a hole in the ceiling following the shooting that had not previously been there, neither Holiday nor David saw a hole in the ceiling. David believed that he would have seen any defect in the ceiling. Holiday retrieved the fired cartridge case, but delegated the responsibility for collecting the drugs to patrol officers. The unfired bullet was not collected. Holiday testified that he unsuccessfully attempted to obtain fingerprints from the fired cartridge case. David testified he did not receive a report indicating Holiday attempted to obtain fingerprints from the fired cartridge case.

Dr. Jill Urban participated in the autopsy of Parker's body. According to Urban, the gunshot to Parker's head caused his death. The bullet traveled from left to right on a slightly downward path and was recovered during the autopsy. There was no stippling around the wound, suggesting the bullet was shot from more than three feet away from Parker. A gunshot residue kit was used to retrieve any gunshot residue on Parker's hands. Vicki Hall, a trace evidence examiner, testified she analyzed the gunshot residue kit and found five particles from the back of Parker's left hand and four particles from the back of Parker's right hand. These particles could have been due to Parker discharging a firearm, having his hands close to a discharging firearm, or handling a firearm or firearm component.

April Stowe, a firearm examiner, testified the bullet recovered during the autopsy was "of a .38, 357 caliber." According to Holiday, a .38 caliber weapon is smaller than a .45 caliber weapon. A .38 caliber weapon is a revolver and, after firing, the cartridge case will remain in the cylinder. However, a .45 caliber weapon will eject the cartridge after the weapon is fired. Holiday agreed that if Parker was shot with a .38 caliber weapon, there was a fired .45 cartridge case in the house, and Parker had gunshot residue on his hands, a reasonable person could make a determination that Parker fired a handgun.

–6–

Gonzalez testified that, after he was released from the penitentiary on May 10, 2011, he got a construction job and attempted to stay away from the gang. On September 26, 2011, there was no work to do at Gonzalez's job and he went home at approximately 7:30 a.m. Gonzalez and several other men went to Gonzalez's parents' house. Sergio, who was fourteen or fifteen years old, came to the house and asked Gonzalez for a ride to purchase marijuana. Gonzalez did not want Sergio going by himself to buy drugs, so he took Sergio to the house. Gonzalez picked the house because it had the "best" marijuana and the "fatter sacks." Gonzalez testified he took a .38 caliber revolver with him because it was a dangerous neighborhood. Gonzalez had the gun in the waistband of his pants, but testified his shirt covered the gun.

Because Gonzalez was on parole and did not want to be caught buying drugs, he parked his black Suburban across the yard and left the car's engine running so that he could get "in and out." When Gonzalez approached the house, he saw the door was "cracked" and there was a "young man" inside with a gun in his hand. Gonzalez did not know Parker. Gonzalez said, "Little Homie, sell me a 20 sack." Parker then moved toward the couch and asked Gonzalez, "you Pelon?" Gonzalez replied, "Yeah, Little Homie, sell me a 20 sack." According to Gonzalez, Parker "raised up" and shot at him. Gonzalez "blacked out" and "didn't see nothing." Parker then shot at him a second time. Gonzalez pulled his gun, turned his head to the side, and shot at Parker. Gonzalez was not required to cock the revolver before shooting. Gonzalez agreed that it was a "lucky shot for a man who was not even looking at his target." According to Gonzalez, he did not intend to harm Parker. Gonzalez testified that he was "not necessarily" blaming Parker's death on Giddings and Dion, but if Parker had not been in the house "this accident would never have happened."

Gonzalez testified he immediately left the house and drove to his parents' house. Gonzalez denied taking the guns, drugs, or money from the house. He left the Suburban in the

backyard of his parents' house and asked somebody for a ride. Gonzalez threw the .38 caliber revolver out of the car to the side of the freeway. According to Gonzalez, he was afraid because he had shot Parker and because he knew what Giddings, Dion, and the rest of the Trey Overton Bloods were capable of doing. He went to Mexico because he was afraid a family member would get hurt in a "drive-by" if he stayed in Dallas. Dion admitted that, when Parker was shot, he threatened to kill Gonzalez. According to David, a person might flee to Mexico because they were trying to hide something.

Gonzalez spent six weeks in Mexico in a small village. He did not have a job and was forced to rely on his wife and his mother to send him money. It was not the same lifestyle that Gonzalez had in Dallas. Gonzalez surrendered to the Mexican authorities and was extradited to the United States.

In its charge, the trial court instructed the jury on the law applicable to the offense of murder and to self-defense. The jury found Gonzalez guilty of murder. Gonzalez pleaded true to the enhancement paragraph in the indictment. The jury found the enhancement paragraph to be true and assessed punishment of twenty-five years' imprisonment.

### Sufficiency of the Evidence

In his first issue, Gonzalez contends the evidence is insufficient to support the conviction. Gonzalez specifically argues no rational fact finder could have found against him on his claim of self-defense.

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013); *Kirk v. State*, 421 S.W.3d 772, 776–77 (Tex. App.—Fort Worth 2014, pet. ref'd) (applying *Jackson* standard to jury's rejection of self-defense claim). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have

–8–

found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise*, 364 S.W.3d at 903 ("The factfinder exclusively determines the weight and credibility of the evidence."). We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the jury. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury").

The initial burden to produce evidence supporting self-defense rests with the defendant. *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State,* 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). Once the defendant produces some evidence, the State bears the ultimate burden of persuasion to disprove the raised defense. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14. This burden of persuasion does not require that the State produce evidence, but it does require that the State prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913. The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject any defensive evidence on the issue.

*Saxton*, 804 S.W.2d at 913–14. If the jury finds the defendant guilty, then it implicitly finds against the defensive theory. *Id.* at 914. In reviewing the legal sufficiency of the evidence to support the fact finder's rejection of a defensive issue, "we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Id.* at 914; *see also Kirk*, 421 S.W.3d at 777.

A person commits murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (b)(2) (West 2011). However, under certain circumstances, self-defense justifies the use of deadly force. *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). As relevant here, a person is justified in using deadly force against another (1) if he would be justified in using force against the other under section 9.31 of the penal code, and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. TEX. PENAL CODE ANN. § 9.32(a)(1), (a)(2)(A) (West 2011). As relevant to this case, section 9.31 of the penal code justifies force "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2011).

Gonzalez testified that, after he confirmed he was Pelon, Parker shot at him twice. He then shot at Parker to protect himself. Gonzalez admitted he shot Parker, but testified he did not intend to harm Parker. However, the jury also heard evidence that Sergio had previously stolen from Giddings and that Giddings and Gonzalez had recently been in a physical altercation.

–10–

Gonzalez testified that Giddings attempted to continue the fight at Gonzalez's parents' house and that Dion brought a gun to his parents' house. Although Gonzalez and Dion testified Gonzalez and Giddings had "made up," Dion testified this did not mean the issues between the two men had been resolved.

Dion testified that, if people in the neighborhood saw Giddings's car, they would think Giddings was nearby. On September 26, 2011, Giddings's car was parked at the house. Antwanette testified she saw Gonzalez and Sergio, followed by Gonzalez's brother, driving around the neighborhood. Shortly after Dion left the house, Gonzalez parked his Suburban across the yard so that it blocked the camera and got out, leaving the engine running. King testified that Gonzalez aggressively asked to come into the house. Gonzalez went into the house with a .38 revolver that was already cocked hidden in the waistband of his pants. Almost immediately after Gonzalez entered the house, King, Dion, and Polley heard gunshots from inside the house.

Dion testified the shots came from more than one handgun. Parker was armed with a .45 caliber handgun. The police found in the house a casing that had been fired from a .45 caliber handgun, and gunshot residue was found on Parker's hands. Parker's body was found by the couch with his hand close to the shoe box in which the marijuana was kept. The bullet traveled at a downward trajectory, raising an inference that Parker was leaning over at the time he was shot. Dion saw Gonzalez leaving the house with something in his hand, and marijuana, guns, and money were missing from the house. Gonzalez fled to Mexico following the shooting.

Based on the evidence, the jury could have reasonably inferred that Gonzalez had experienced problems with Giddings and decided to either harm or rob him. Because Giddings's car was parked at the house, Gonzalez believed Giddings was there as well. Gonzalez drove around the neighborhood, waiting for Dion to leave the house. After Dion left, Gonzalez went

–11–

into the house aggressively with a cocked revolver and demanded something from Parker. A reasonable fact finder could infer that, as Parker was leaning over to pick up the marijuana, he felt threatened by Gonzalez's actions and shot the .45 caliber handgun. Gonzalez then shot and killed Parker.

Gonzalez's testimony that Parker fired the first shot does not conclusively prove self-defense as a matter of law. *London v. State*, 325 S.W.3d 197, 203 (Tex. App.—Dallas 2008, pet. ref'd); *Dearborn v. State*, 420 S.W.3d 366, 374 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Saxton*, 804 S.W.2d at 914 (credibility determination concerning defensive evidence is solely within jury's province and jury is free to accept or reject such evidence). Rather, the jury was the sole judge of credibility and weight to be given the testimony and was not obligated to believe Gonzalez's account that Parker was the first aggressor. *See Saxton*, 804 S.W.2d at 914. Considering all the evidence in the light most favorable to the jury's verdict, we conclude the evidence is sufficient to support the jury's implicit rejection of Gonzalez's claim of self-defense. *See id.* We resolve Gonzalez's first issue against him.

### Right to Confrontation

In his second issue, Gonzalez asserts the admission into evidence of testimony by a medical examiner who did not perform the autopsy on Parker, the autopsy report, and photographs taken during the autopsy violated his right to confront the witnesses against him.

The State called Dr. Jill Urban, a medical examiner at the Southwestern Institute of Forensic Sciences (SWIFS), to testify about the autopsy performed on Parker. Urban testified outside the presence of the jury that, although she signed the autopsy report, the autopsy was performed by Dr. Emily Berry who, at the time of trial, was a forensic pathologist in Colorado.

When the autopsy was performed, Berry was a fellow doing her training at SWIFS. Urban was Berry's supervisor and was present for portions, but not all, of the autopsy. Urban

–12–

testified that she "was the staff on this case and was either there or in communication with Dr. Berry from beginning to end of this case." According to Urban she was "certainly there to see" the wound examination and the pertinent internal and external findings. Urban testified she also reviewed the photographs from the autopsy. Although Berry compiled the autopsy report, Urban reviewed the report before she signed it and either personally made corrections or suggested corrections to Berry. Urban testified she had an opportunity to make her own conclusions and those conclusions were dictated in the autopsy report. Urban did not have an independent recollection of the autopsy, but indicated it was "probably not normal for [her] to remember anything without being able to refer to the report, especially if it happened several years ago." Gonzalez objected that Berry's absence from trial violated his right to confront the witnesses against him.

Urban testified in front of the jury that Parker's death was caused by a gunshot wound to his left forehead. The bullet, which was recovered during the autopsy, traveled from the left side to the right side of Parker's head on a slightly downward trajectory. Parker's death was ruled a homicide. The autopsy report was admitted into evidence over Gonzalez's objection that it violated his right to confront the witnesses against him. A number of photographs taken during the autopsy were also admitted into evidence. Gonzalez's only objection to the photographs was that Urban did not have personal knowledge of the photographs because she did not know who took the photographs, when the photographs were taken, or if the photographs were accurate.

We review a trial court's admission of evidence for an abuse of discretion. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). However, when reviewing a constitutional legal ruling, such as whether a statement is testimonial or non-testimonial, we give almost total deference to the

–13–

trial court's determination of historical facts and review de novo the trial court's application of the law to those facts. *Wall*, 184 S.W.3d at 742 (applying hybrid standard of review to issue of whether statement was testimonial); *Mason v. State,* 225 S.W.3d 902, 906–07 (Tex. App.—Dallas 2007, pet. ref'd) (same).

Under the Confrontation Clause of the Sixth Amendment of the United States Constitution, "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court has interpreted this right to mean that "testimonial" evidence is inadmissible at trial unless the witness who made the testimonial statement either takes the stand to be cross-examined or is unavailable and the defendant had a prior opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004); *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). "While the exact contours of what is testimonial continue to be defined by the courts, such statements are formal and similar to trial testimony." *Burch*, 401 S.W.3d at 636. Testimonial statements include: (1) "ex parte in-court testimony or its functional equivalent," i.e., "pretrial statements that declarants would expect to be used prosecutorially"; (2) "extrajudicial statements contained in formalized testimonial materials," such as affidavits, depositions, or prior testimony; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010); *see also Crawford*, 541 U.S. at 51–52. Assuming Urban's testimony, the autopsy report, and the photographs taken during the autopsy[1] were testimonial, we conclude Gonzalez was not harmed by the admission of this evidence.

---

[1] Because Gonzalez objected to the admission of the photographs only on the ground that Urban did not have personal knowledge of the taking of the photographs, we question whether Gonzalez preserved his complaint that the admission of the photographs violated his right to confrontation. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (issue on appeal must comport with objection at trial). We

Error in admitting evidence in violation of a defendant's right to confront the witnesses against him is constitutional error, which requires reversal unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a); *Langham*, 305 S.W.3d at 582. The question is not whether the verdict was supported by the evidence. *Langham*, 305 S.W.3d at 582 (quoting *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)). Rather, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at their decision, that is, whether the error adversely affected the integrity of the process leading to the decision. *Id.* In determining whether a Confrontation Clause error may be declared harmless beyond a reasonable doubt, we consider: (1) how important the out-of-court statement was to the State's case; (2) whether the out-of-court statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and (4) the overall strength of the prosecution's case. *Id.* We also consider other constitutional harm factors, if relevant, such as the nature of the error, whether or to what extent it was emphasized by the State, probable implications of the error, and the weight a juror would probably place on the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* (quoting TEX. R. APP. P. 44.2(a)). Ultimately, after considering these various factors, the reviewing court must be able to declare itself satisfied, to a level of confidence beyond a reasonable doubt, that the error did not contribute to

---

further note that there is authority that photographs taken during an autopsy are not testimonial. *Herrera v. State*, 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Wood v. State*, 299 S.W.3d 200, 214–15 (Tex. App.—Austin 2009, pet. ref'd). However, assuming the photographs were testimonial and that Gonzalez preserved his complaint, we conclude he was not harmed by the admission of the photographs taken during the autopsy.

the conviction before it can affirm it. *Langham*, 305 S.W.3d at 582 (quoting *Scott*, 227 S.W.3d at 690–91).

Here, Urban's testimony, the autopsy report, and the autopsy photographs were relevant to establish that Parker died from a gunshot wound to the head. This fact was not only undisputed, but was corroborated by testimony from other witnesses, including law enforcement personnel and the paramedic who responded to the scene. Further, Gonzalez admitted he shot Parker in the head and killed him, but claimed he did so in self-defense. The State did not emphasize the autopsy, the photographs, or Urban's testimony during closing arguments. Gonzalez neither challenged the evidence of the cause of Parker's death nor suggested any other cause. In short, no evidence contradicted the complained-of evidence and a great amount of evidence supported it.

Gonzalez asserts he was harmed by Berry's absence from trial because she was the "chain of custody" for trace evidence which was analyzed by other forensic experts. In his appellate brief, Gonzalez does not point to the chain of custody of any specific trace evidence about which he wished to cross-examine Berry. However, the only trace evidence obtained during the autopsy that was tested by other forensic experts was the .38 caliber bullet that killed Parker and the gunshot residue kit from Parker's hands. There was no issue at trial regarding the chain of custody of this evidence. Gonzalez admitted he used his .38 caliber revolver to shoot Parker in the head and the gunshot residue on Parker's hands supported a conclusion that Parker discharged the .45 caliber semi-automatic pistol shortly before his death, a fact that Gonzalez argued was consistent with his self-defense theory. Gonzalez did not challenge the results of the additional testing performed on either the bullet or the gunshot residue kit.

We conclude beyond a reasonable doubt that the introduction of Urban's testimony, the autopsy report, and the photographs taken during the autopsy did not materially affect the jury's

deliberations. Accordingly, any error by the trial court in admitting this evidence was harmless. *See Lee v. State*, 418 S.W.3d 892, 900–01 (Tex. App.—Houston [14th Dis.] 2013, pet. ref'd); *Martinez v. State*, 311 S.W.3d 104, 112–14 (Tex. App.—Amarillo 2010, pet. ref'd).[2] We resolve Gonzalez's second issue against him.

### *Brady*

In his third issue, Gonzalez asserts the State's failure to disclose records relating to communications between Stowe, David, and Tommy LeNoir, an investigator with the District Attorney's Office, discussing the .45 caliber cartridge case violated his right to due process and a fair trial and the Fifth and Fourteenth Amendments of the United States Constitution. Gonzalez specifically argues the evidence was exculpatory and the State was required to produce it pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).

Stowe testified that she brought to trial her report, the notes she took during her examination of the .38 caliber bullet recovered during the autopsy, as well as "some communications that occurred throughout the process." On cross-examination, Gonzalez's counsel requested she be allowed to see the communications Stowe had referenced. The communications were a series of emails, dated between March 28, 2012 and April 30, 2012, between LeNoir, Stowe, and David regarding Stowe examining the .45 caliber cartridge case recovered from the house. In one email, LeNoir indicated one reason for the examination was:

> we've received information that [Parker] may have been in possession of a 45 cal. pistol when the offense occurred. No firearm was recovered from the crime scene and likely removed by someone prior to the arrival of DPD.
>
> In learning that the projectile recovered during autopsy was linked to a revolver our suspicions grew that [Parker] might [have] discharged a 45 caliber firearm at the time of the offense.

---

[2] *See also Hernandez v. State*, No. 05-11-01300-CR, 2013 WL 1282260, at *6-7 (Tex. App.—Dallas Mar. 6, 2013, pet. ref'd) (not designated for publication); *Vela v. State*, No. 04-11-00080-CR, 2012 WL 2336242, at *4 (Tex. App.—San Antonio June 20, 2012, no pet.) (mem. op., not designated for publication).

We are hoping to determine whether or not the fired 45 RP cartridge is comparable to (or) excluded as one of two described firearms reportedly in the home (crime scene) when the offense occurred.

In another email, LeNoir indicated the prosecutor "requested an examination to identify manufacture name and model of firearms identified to the tool markings and impressions on the casing recovered from the crime scene." Gonzalez's counsel objected that these communications contained "*Brady* material" and had not previously been produced by the State.

Stowe testified she never received the .45 caliber cartridge case and did not examine it. In his case-in-chief, Gonzalez called LeNoir. LeNoir testified the fired cartridge case indicated a firearm had possibly been discharged. LeNoir requested Stowe examine the cartridge case to determine whether there was a toolmarking pattern on it that would provide an identifiable trail to the firearm that shot the cartridge. LeNoir testified the State did not have a gun to match to the cartridge case, but believed SWIFS could give "a kind of library of the potential firearms that are consistent with firing that casing."

The State offered, and the trial court admitted, an April 19, 2012 report from Susan B. Allen, a Firearms Examiner with the Dallas Police Department. In her report, Allen stated she had examined the .45 caliber "fired cartridge case" and entered it into a national database. The cartridge was not "associated" with any information already in the database. Further, in Allen's opinion, the cartridge case "lacks the features necessary to determine the brand of gun that may have fired it."

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The purpose of this rule is to avoid an unfair trial of the accused: "A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps

–18–

shape a trial that bears heavily on the defendant." *Id.* at 87–88. To establish reversible error on a *Brady* claim, a defendant must show (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Ex parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012). *Brady* does not require the State to conduct independent investigations to seek out *Brady* material on behalf of a defendant. *Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006). Further, there is no duty on the part of the State to disclose evidence of which the defendant was aware or other evidence if the defendant "could have accessed it from other sources." *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011).

Assuming the communications between LeNoir, Stowe, and David about a potential examination of the cartridge case are "evidence" subject to disclosure under *Brady*, we cannot conclude Gonzalez established the evidence was either favorable to him or material to the outcome of the case. Favorable evidence is that which, if disclosed and used effectively, "may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Ex parte Miles*, 359 S.W.3d at 665. Favorable evidence includes exculpatory evidence and impeachment evidence. *Ex parte Miles*, 359 S.W.3d at 665 "Exculpatory evidence is that which may justify, excuse, or clear the defendant from fault, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence." *Id.*

Evidence that Parker fired a .45 caliber gun at Gonzalez could have supported Gonzalez's claim he acted in self-defense and, therefore, would be exculpatory. However, the examination LeNoir requested Stowe perform would not have established Parker fired a gun. Because the State did not recover any guns from the house, it could not be determined whether the cartridge case was fired by one of those guns. The only information LeNoir thought Stowe possibly could

–19–

provide after examining the cartridge case was a "library" of the firearms that potentially could have fired the gun. However, Allen examined the cartridge case and opined the cartridge case lacked "the features necessary to determine the brand of gun that may have fired it." There is no evidence in the record that the examination by Stowe of the cartridge case would have led to any information that would have been favorable to Gonzalez.

Further, Gonzalez must show the communications between LeNoir, Stowe, and David were material to the case. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–110 (1976); *see also Ex parte Miles*, 359 S.W.3d at 666. Rather, Gonzalez must show that "in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure." *Ex parte Miles*, 359 S.W.3d at 666 (quoting *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002)); *see also Smith v. Cain*, 132 S.Ct. 627, 630 (2012). A reasonable probability of a different result is shown when the State's evidentiary suppression undermines confidence in the outcome of the trial. *Smith*, 132 S.Ct. at 630 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)); *Ex parte Miles*, 359 S.W.3d at 666. When evaluating whether the materiality standard is satisfied, the strength of the exculpatory evidence is balanced against the evidence supporting the conviction. *Ex parte Miles*, 359 S.W.3d at 666; *see also Smith*, 132 S.Ct. at 630–31.

Here, the undisclosed communications established only that LeNoir wanted Stowe to examine the fired cartridge case because he had information Parker had fired a weapon. The examination could not have connected the fired cartridge case to Parker but, at most, could have provided a list of weapons that potentially fired the cartridge. However, it was undisputed that, when Dion left the house with Polley, he gave his .45 caliber Smith & Wesson handgun to

Parker. Dion heard two different guns fired in the house, and gunshot residue was found on Parker's hands. Although David and Holiday did not see a defect in the ceiling of the house, Dion testified there was a bullet hole in the ceiling of the house that was not there when he left with Polley. Gonzalez testified that Parker fired two shots at him, and he then shot Parker with his .38 caliber revolver.

Although there was substantial evidence to support an inference that Parker fired a .45 Smith & Wesson caliber handgun inside the house, the jury rejected Gonzalez's claim of self-defense and found Gonzalez guilty of murder. We cannot conclude that, even if Stowe determined a Smith & Wesson handgun could have fired the cartridge, this information would have impacted the jury's decision that Gonzalez was not acting in self-defense when he shot Parker.

Because Gonzalez failed to establish the withheld communications were either favorable to him or were material to the outcome of the trial, we resolve his third issue against him.

## Jury Charge Error

In his fourth issue, Gonzalez contends the trial court erred by refusing to instruct the jury that the State was required to disprove the issue of self-defense beyond a reasonable doubt. Gonzalez asserts that, during the charge conference, he requested an instruction that "the State must disprove the issue of self-defense beyond a reasonable doubt" and, because the issue concerned the law applicable to the case, the trial court also had a duty to *sua sponte* instruct the jury on the issue.

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). If error exists, we must determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State,* 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). When, as in this case, the error was objected to, we reverse if we find any

–21–

actual harm to the defendant. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). In assessing actual harm, we examine the harm "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

The purpose of the jury charge is to inform the jury of the applicable law and guide the jurors in applying it to the facts of the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). Under article 36.14 of the code of criminal procedure, the trial court shall deliver to the jury "a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007); *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011). This duty exists even when defense counsel fails to object to inclusions or exclusions in the charge and thus may require the trial court to *sua sponte* instruct the jury on the law applicable to the case. *Taylor*, 332 S.W.3d at 486.

The trial court is required to instruct the jury it must acquit the defendant if it has reasonable doubt on the existence of a defensive issue. TEX. PENAL CODE ANN. § 2.03(d) (West 2011). However, as noted above, a defendant has the burden of producing some evidence to support a claim of self-defense. *Zuilani*, 97 S.W.3d at 594. The State has the burden of persuasion in disproving self-defense. *Saxton*, 804 S.W.2d at 913. This burden does not require the State to produce evidence refuting the self-defense claim; rather, the burden requires the State to prove its case beyond a reasonable doubt. *Id.* The penal code places the burden on the State to prove each element of the offense charged; it does not require the State to "negate the existence of a defense." TEX. PENAL CODE ANN. § 2.03(b).

–22–

The trial court instructed the jury on the law of self-defense. It then instructed the jury that:

> if you further find from the evidence, or you have a reasonable doubt thereof, that viewed from the standpoint of the defendant at the time, he reasonably believed that the use of deadly force on his part was reasonably necessary to protect himself against Jarrell [sic] Parker's use or attempted use of unlawful deadly force, then you will find the defendant not guilty of murder as charged in the indictment.

The trial court instructed the jury that the law did not require Gonzalez "to prove his innocence or produce any evidence at all" and that the State had "the burden of proving the defendant guilty." The trial court also instructed the jury that the State was required to prove "each element as charged beyond a reasonable doubt, and if it fail[ed] to do so, you must acquit the defendant." Thus, the charge correctly instructed the jury that it was required to acquit Gonzalez if it had reasonable doubt on the self-defense issue. *See id.* § 2.03(d).

Although the State had the burden of persuasion in disproving a claim of self-defense, it was not required to produce evidence refuting the claim. *Saxton*, 804 S.W.2d at 913.[3] The trial court delivered a charge that properly instructed the jury to acquit Gonzalez if it believed he acted in self-defense or if it had a reasonable doubt as to whether he acted in self-defense. The charge adequately instructed the jury on the State's burden and the jury's consideration of Gonzalez's claim of self-defense. *See id.*; *Luck v. State*, 588 S.W.2d 371, 375 (Tex. Crim. App. 1979) (op. on reh'g); *Brotherton v. State*, 666 S.W.2d 126, 127–28 (Tex. App.—Houston [14th Dist.] 1983, pet. ref'd).[4] Accordingly, the trial court did not err by submitting the jury charge

---

[3] *See also Shafer v. State*, No. 05-06-01321-CR, 2008 WL 2699733, at *3 (Tex. App.—Dallas July 11, 2008, no pet.) (not designated for publication); *Davidson v. State*, No. 03-08-00446-CR, 2009 WL 3230777, at *2–3 (Tex. App.—Austin 2009, no pet.) (mem. op., not designated for publication).

[4] Gonzalez relies on one sentence in *Alonzo v. State*, 353 S.W.3d 778, 781 (Tex. Crim. App. 2011) for the proposition the trial court should have instructed the jury that it was required to acquit Gonzalez if the State had not disproved self-defense beyond a reasonable doubt. However, *Alonzo* dealt with whether self-defense is applicable to a manslaughter charge, which has a mental state of recklessness. Read in its entirety, we cannot conclude *Alonzo* changed the State's burden relating to a claim of self-defense, and we have found no case that has construed *Alonzo* to have made such a significant change in the law.

–23–

without including an instruction that the State was required to disprove the issue of self-defense beyond a reasonable doubt. *Id.* We resolve Gonzalez's fourth issue against him.

We affirm the trial court's judgment.


/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE


Do Not Publish
TEX. R. APP. P. 47

130630F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JOSE GONZALEZ, Appellant

No. 05-13-00630-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas,
Trial Court Cause No. F-11-60352-I.
Opinion delivered by Justice Fillmore,
Justices Evans and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 14th day of July, 2014.