**Opinion issued June 27, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00528-CR

_____

**HECTOR HENRIQUEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1578931**

---

## O P I N I O N

A jury convicted appellant, Hector Henriquez, of the first-degree felony offense of murder.[1] The trial court assessed his punishment at eighty years'

---

[1]     *See* TEX. PENAL CODE ANN. § 19.02(b).

confinement. In one issue on appeal, appellant contends that the trial court erred when it admitted the complainant's written autopsy report, completed by a medical examiner who did not testify at trial, in violation of the Confrontation Clause.

We affirm.

## Background

On April 22, 2016, Ivania Salguero spoke with her good friend Jason Cisneros, the complainant, and they discussed the possibility of Cisneros's visiting Ivania that evening at her parents' house in southwest Houston, where she lived. Later that evening, while Ivania was inside watching a movie with her father, Carlos Salguero, Cisneros drove to the Salgueros' house and parked his Jeep outside. Cisneros texted Ivania that he was outside of her house.

The Salgueros lived next door to appellant's parents. On the night of April 22, Irma Baza, who had been dating appellant for several months, drove to appellant's parents' house with two of her small children. When she arrived, Baza called for appellant to come outside, and when he eventually did, he appeared to be angry. An argument ensued between Baza and appellant while they were standing outside and, during the course of this argument, appellant slapped Baza in the face. After appellant struck Baza, Cisneros, whom Baza had never met, got out of his Jeep, which had been parked next door at the Salgueros' house, and intervened.

2

Cisneros told appellant that he should not hit a woman, and the two men began arguing. At one point during the argument, Cisneros stepped behind appellant and wrapped him in a bear hug to stop him from being violent. According to Baza, this was the only physical contact that occurred between Cisneros and appellant. After Cisneros let appellant go, appellant pulled a handgun out from underneath his shirt and shot Cisneros. Cisneros tried to run away down the street, and appellant fired a second shot. Baza did not know if the second shot hit Cisneros, but he did not make it very far down the street before he fell down.

Baza moved her vehicle and parked in the middle of the street to be closer to where Cisneros was lying, and she called 9-1-1 and attempted to perform CPR. After Baza moved closer to Cisneros, appellant walked over and kicked Cisneros twice in the head.

Ivania and Carlos Salguero heard the gunshots from their living room. Ivania and Carlos both went outside, and, when they saw Cisneros's Jeep, they began looking for him. They saw appellant, whom they had both known for many years, standing outside. Ivania asked appellant what had happened, and he told her, "Go inside, go inside, I shot someone." Carlos was still looking for Cisneros, whom he could not see, but when a car drove by, Carlos was able to see someone lying on the ground. Carlos began walking in that direction, and appellant said to him, "No, Don Carlos, don't go there." Carlos ignored appellant, and he discovered Cisneros lying

3

in the grass near the street. Ivania walked over as well and called 9-1-1. Cisneros was still alive, but he was struggling to breathe. At some point after Ivania and Carlos discovered Cisneros, appellant went inside his parents' house and then left the scene entirely. An ambulance arrived shortly thereafter and took Cisneros to the hospital, where he died from his injuries.

Houston Police Department (HPD) Officer W. Linares was on patrol when he and his partner received a dispatch concerning the shooting of Cisneros. Linares and his partner were the first police unit on the scene, and they arrived at approximately the same time as the ambulance. Upon arriving at the scene, Linares and his partner could not immediately find Cisneros. It was only when they saw Baza's vehicle parked in the middle of the street that they could see Cisneros lying in the grass by the street and a driveway. Baza was crying, and Cisneros was bleeding heavily and was nonresponsive. Linares told Baza to move her vehicle so the ambulance could move closer to Cisneros. Baza did so, and the EMTs quickly loaded Cisneros into the ambulance.

Given the quick response time to the scene following the 9-1-1 calls, Officer Linares believed that there was a high likelihood that the suspect was still in the area, and he asked Baza if she had seen a suspect. Baza initially told Linares that "there was a tall, skinny guy wearing a black shirt, tan pants that shot [Cisneros] and left the scene." Linares put out a general broadcast for a person matching this

4

description. Baza was shaking and crying throughout the entire time Linares was present at the scene. When he learned that Cisneros had passed away at the hospital, he informed Baza, who "broke down crying" and told Linares, "Okay, I'll tell you what happened." Baza then identified appellant, her boyfriend, as the person who shot Cisneros. She told Linares why she had gone over to appellant's parents' house, she described her argument with appellant and appellant's assault of her, and she told Linares about Cisneros's intervention in the argument. Baza told Linares that appellant was able to get behind Cisneros and that he shot Cisneros "at very close range" before shooting at Cisneros again when he tried to run away. Baza then told Linares that, before appellant left the scene, appellant told her "that if he goes to jail, it would be because of her, he just killed someone because of her." Linares put out a second general broadcast with a correct description of appellant as the suspect.

HPD Sergeant T. Simmons, with the Homicide Division, spoke with Baza at the scene and rode with her to HPD headquarters in downtown Houston. While Baza was driving, she received several phone calls from appellant, in which he apologized "for what he did" and told her where he was. The officers used these phone calls to determine that appellant was near a bayou close to the scene of the shooting. Officer Linares called for a tactical unit to go to the scene, and this unit took appellant into custody underneath a bridge near a bayou. Officer K. Daignault, also with the Homicide Division, joined the tactical unit that found appellant. When Daignault

5

arrived at the bayou, the tactical unit officers searched appellant and discovered a semiautomatic handgun in his waistband. Daignault took the gun and gave it to Christine Stobaugh, a crime scene investigator with the Houston Forensic Science Center, who was processing the scene of the shooting for evidence.

Stobaugh took a video recording and numerous pictures of the scene, all of which were admitted into evidence. At the scene, Stobaugh documented two spent cartridge casings lying on the ground near Cisneros's Jeep. Stobaugh documented four separate bloodstains on the concrete further down the street from Cisneros's Jeep. Three of the bloodstains were located in the street, and the fourth was located on the sidewalk just beyond a strip of grass. Stobaugh collected the handgun given to her by Officer Daignault and the cartridge casings from the scene, and these items were submitted for further testing.

After appellant was taken into custody, Sergeant Simmons tested appellant's hands for gunshot residue. Jason Schroeder, the manager of the trace laboratory at the Harris County Institute of Forensic Sciences, analyzed the samples taken from the gunshot residue test. Appellant's right hand had two particles of gunshot residue, and his left hand had three particles. The result for the right hand was considered "inconclusive," but, with respect to the left hand, Schroeder concluded that the three particles "likely resulted from activity such as firing a weapon, being in close

6

proximity to a firearm during discharge, handling a firearm, a fired cartridge, or some surface bearing [gunshot residue]."

Ryan Hookano, a firearms examiner for the Houston Forensic Science Center, tested the handgun recovered from appellant and the cartridge casings found at the scene of the shooting. Based on the testing performed, Hookano concluded that the cartridge casings at the scene were fired from the handgun that was in appellant's possession at the time of his arrest.

Dr. Dana Hopson, an assistant medical examiner at the Harris County Institute of Forensic Sciences, testified concerning the autopsy performed on Cisneros. Dr. Hopson did not perform the autopsy on Cisneros; instead, the autopsy was performed by Dr. Alex John who, by the time of appellant's trial, had left the Institute of Forensic Sciences and was employed at the Montgomery County Medical Examiner's Office. Dr. Hopson stated that she had "independently review[ed]" the autopsy report that Dr. John had completed and the photographs taken during the autopsy. When the State offered the autopsy report completed by Dr. John into evidence, defense counsel objected on the basis of the Confrontation Clause because Dr. John was not present to testify and counsel had not had a chance to cross-examine him concerning his autopsy report. The trial court overruled the objection and admitted the autopsy report into evidence.

Dr. Hopson testified that Cisneros had two gunshot wounds: an entrance wound on the left side of his back and an exit wound beneath his left collarbone. No projectiles were recovered from Cisneros's body during the autopsy, and no stippling was observed near the entrance wound on Cisneros's back or on his clothing. The projectile passed through muscle, ribs on the left side of Cisneros's body, his left lung, and several blood vessels. The State offered several photographs taken during Cisneros's autopsy. Defense counsel did not object to these photographs, nor did counsel object to any of Dr. Hopson's testimony.

On cross-examination, Dr. Hopson agreed with defense counsel that the projectile traveled a straight path "from [the] middle of the back up towards the clavicle or collarbone area before exiting." She also agreed that the angle of the projectile's trajectory was "sharply upward." Based on the relative placements of the wounds, "this projectile moved from the back towards the front, and it moved from the left toward the right and went upward as it exited." On redirect examination, the State asked whether the trajectory of the projectile was consistent with Cisneros's "running away from and ducking from a gun when he was shot." Dr. Hopson responded:

> So typically if I'm given a scenario, I can determine if—based on the trajectory if that would fit with a scenario. So in this case, the projectile, as I mentioned, is going from the back, from the left towards the right, and going sharply upwards. So that means that either the gun is lower than where the entrance [wound] was or the decedent was tilted or

8

lower than the gun or at a level similar to the gun, because as we described, the projectiles go in a straight line. So that scenario could fit.

She then agreed with defense counsel that other scenarios could "fit with that angle," including if the shooter was "significantly shorter" than Cisneros. Dr. Hopson testified that Cisneros was six feet tall, and she estimated, based on observing appellant standing in the courtroom, that he appeared to be shorter than six feet tall, although she did not estimate a particular height for appellant.

The jury found appellant guilty of murder, and the trial court assessed his punishment at eighty years' confinement. This appeal followed.

## Confrontation Clause

In his sole issue on appeal, appellant contends that the trial court violated the Confrontation Clause by admitting an autopsy report when the author of that report did not testify at trial.

### A. *Standard of Review and Governing Law*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement. *Id.* at 83. Before we may reverse the trial court's decision admitting evidence, we must find that the trial court's ruling was "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)).

9

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. "The main purpose behind the Confrontation Clause is to secure for the opposing party the opportunity of cross-examination because that is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Johnson v. State*, 490 S.W.3d 895, 909 (Tex. Crim. App. 2016) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). Another purpose of the Confrontation Clause is

> to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Woodall v. State*, 336 S.W.3d 634, 641–42 (Tex. Crim. App. 2011) (quoting *Mattox v. United States*, 156 U.S. 237, 242–43 (1895)).

To implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature. *Id.* at 642. If those initial requirements are met, the statement is admissible and does not violate the Confrontation Clause only if (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant. *Id.* Whether a statement is testimonial is a question of law that we review de novo. *Gutierrez v.*

10

*State*, 516 S.W.3d 593, 597 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd); *see Woodall*, 336 S.W.3d at 642 (stating that while we defer to trial court's determination of historical facts and credibility, we review constitutional legal rulings de novo). For Confrontation Clause purposes, "testimonial" statements include those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 52 (2004)); *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013) ("While the exact contours of what is testimonial continue to be defined by the courts, such statements are formal and similar to trial testimony.").

An autopsy report is considered testimonial when an objective medical examiner would reasonably believe that the report would be used in a later prosecution. *Williams v. State*, 513 S.W.3d 619, 637 (Tex. App.—Fort Worth 2016, pet. ref'd); *Lee v. State*, 418 S.W.3d 892, 896 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Wood v. State*, 299 S.W.3d 200, 209 (Tex. App.—Austin 2009, pet. ref'd) (noting that, in Texas, medical examiner is statutorily required to conduct inquest when person dies under circumstances warranting suspicion that death was caused by unlawful means) (citing TEX. CODE CRIM. PROC. ANN. art. 49.25 § 6(a)). Although courts have not held that autopsy reports are categorically considered

testimonial statements, in determining whether certain autopsy reports are testimonial, courts have considered whether the autopsy was performed pursuant to the provisions in the Code of Criminal Procedure, whether police officers attended the autopsy, and the circumstances surrounding the death. *See Lee*, 418 S.W.3d at 896; *Wood*, 299 S.W.3d at 209–10.

By contrast, photographs taken during autopsies are not considered statements. *Williams*, 513 S.W.3d at 637. Thus, autopsy photographs are considered nontestimonial in nature and do not implicate the Confrontation Clause. *Id.*; *Herrera v. State*, 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also Wood*, 299 S.W.3d at 214–15 (stating that photograph is not out-of-court statement and that admission of autopsy photographs did not disclose to jury any testimonial hearsay). Furthermore, "an expert may disclose facts from the report of an autopsy conducted by another person if the expert relied on those facts in coming to his or her own conclusions." *Williams*, 513 S.W.3d at 637.

## B.    *Analysis*

In this case, Dr. Alex John, who was an assistant medical examiner with the Harris County Institute of Forensic Sciences, performed an autopsy on Cisneros on April 22, 2016. By the time the case was tried in May 2018, Dr. John had left the Institute of Forensic Sciences and was employed with the Montgomery County Medical Examiner's Office. Dr. John did not testify at appellant's trial. Instead, Dr.

Dana Hopson testified concerning the autopsy performed on Cisneros. Dr. Hopson testified that she "independently review[ed]" Dr. John's autopsy report and the pictures taken during the autopsy, and she referred to the report and to the pictures during her testimony. The trial court admitted the autopsy report into evidence over appellant's objection on the basis of the Confrontation Clause. Defense counsel did not object to Dr. Hopson's testimony or to the pictures taken during the autopsy.

The autopsy report stated that the autopsy was performed "pursuant to Article 49.25, Texas Code of Criminal Procedure." The report indicated that no police officers attended the autopsy. In agreeing that the autopsy report in this case is a testimonial statement, both appellant and the State point out that Cisneros was found lying in the street with a gunshot wound to his back, raising a suspicion that his death was a homicide. The autopsy report listed the cause of Cisneros's death as "[g]unshot wound of torso" and listed the manner of his death as "[h]omicide."

We agree with appellant and the State that, considering the circumstances surrounding Cisneros's death, an objective medical examiner would reasonably believe that the autopsy report prepared by Dr. John would be used in a later prosecution. *See Williams*, 513 S.W.3d at 637; *Lee*, 418 S.W.3d at 896; *Wood*, 299 S.W.3d at 209; *see also* TEX. CODE CRIM. PROC. ANN. art. 49.25 § 9(a) ("If the cause of death shall be determined beyond a reasonable doubt as a result of the investigation, the medical examiner shall file a report thereof setting forth

specifically the cause of death with the district attorney . . . . Upon completion of the autopsy, the medical examiner shall file a report setting forth the findings in detail with the office of the district attorney . . . .").

We thus agree with appellant and the State that the autopsy report constitutes a testimonial out-of-court statement. *See Williams*, 513 S.W.3d at 637; *Lee*, 418 S.W.3d at 896; *Wood*, 299 S.W.3d at 209. Because it is undisputed that Dr. John, the declarant, did not testify at trial and that appellant did not have the opportunity to cross-examine Dr. John before trial, we agree with appellant and the State that admission of this autopsy report violated the Confrontation Clause. *See Woodall*, 336 S.W.3d at 642. We therefore turn to whether admission of the autopsy report harmed appellant.

In assessing the harm arising out of a violation of constitutional rights, we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. TEX. R. APP. P. 44.2(a). "The critical inquiry is not whether the evidence supported the verdict absent the erroneously admitted evidence, but rather 'the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations.'" *Lee*, 418 S.W.3d at 899 (quoting *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)). When reviewing harm for violations of the Confrontation Clause, we consider: (1) how important the out-of-court statement was to the State's case; (2) whether the out-of-

14

court statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and (4) the overall strength of the prosecution's case. *Gutierrez*, 516 S.W.3d at 599 (quoting *Scott*, 227 S.W.3d at 690).

The autopsy report demonstrated that Cisneros died of a single gunshot wound that entered the left side of his back and traveled upward, through his ribs and left lung, before exiting his body below his left collarbone. It is undisputed that Cisneros died of a gunshot wound, and the autopsy photographs, which were non-testimonial and were properly admitted into evidence, also depicted the relative placements of the entrance and exit wounds. Dr. Hopson, who reviewed the autopsy report and the photographs, testified concerning the entrance and exit wounds, and she used the photographs and the appearance of the wounds to explain to the jury how she reached the conclusion that the wound on Cisneros's back was the entrance wound and the wound below Cisneros's collarbone was the exit wound.

The written autopsy report itself, therefore, adds little beyond the autopsy photographs and Dr. Hopson's testimony, both of which were properly admitted and did not implicate the Confrontation Clause. *See Lee*, 418 S.W.3d at 900 (stating that relevance of autopsy report was that complainant died of multiple gunshot wounds, "which was not only undisputed but readily apparent even to a lay person," that key evidence that defendant was one of several carrying firearms during robbery and that

gunfight with complainant ensued was undisputed and independent from autopsy, and, therefore, autopsy report's importance was minimal, weighing heavily against reversal of conviction); *see also Williams*, 513 S.W.3d at 637 (stating that, even though autopsy reports can be considered testimonial for Confrontation Clause purposes, "an expert may disclose facts from the report of an autopsy conducted by another person if the expert relied on those facts in coming to his or her own conclusions").

Appellant argues, however, that there was a dispute concerning the trajectory of the bullet through Cisneros's body and that Dr. Hopson, in testifying concerning the trajectory and the entrance and exit wounds, "simply regurgitate[d]" Dr. John's conclusions in the autopsy report as her own, which harmed appellant. The autopsy report described the size of the entrance and exit wounds, as well as their relative placements compared to the top of Cisneros's head and the midline of his spine. The report then stated, "The direction of the bullet is back to front, left to right, and upwards."

In addition to using the autopsy photographs to explain the placement of the wounds on Cisneros's body, Dr. Hopson also used a diagram from the autopsy report where Dr. John had made notations of the entrance and exit wounds. On cross-examination, defense counsel elicited testimony from Dr. Hopson that the trajectory of the bullet was a straight line and that the angle of the trajectory was "sharply

upward." Dr. Hopson agreed with the State that the trajectory of the projectile was consistent with Cisneros "running away from and ducking from a gun when he was shot." She also agreed with defense counsel that the trajectory could be consistent with "other scenarios," and she agreed with defense counsel that one such scenario could be if the shooter was shorter than Cisneros, although she stated that, given the placement of the entrance wound on the mid-to-lower portion of Cisneros's back, the shooter would have to be "significantly shorter" than Cisneros. This testimony is not evidence of a dispute between Dr. Hopson and Dr. John, evident from the autopsy report, concerning the trajectory of the bullet. Instead, this testimony merely indicates that more than one situation could lead to the occurrence of this particular projectile trajectory. Moreover, evidence of the trajectory of the bullet came not just from the written autopsy report but also from the properly-admitted autopsy photographs and Dr. Hopson's testimony based on those photographs.

Furthermore, the State's case against appellant was strong. Irma Baza was an eyewitness to the confrontation between appellant and Cisneros, and she testified that, after Cisneros released appellant from a bear hug that he had put appellant in to attempt to prevent appellant from using violence, appellant pulled out a handgun from his waistband and shot at Cisneros. Cisneros turned and started to run away from appellant, who shot at him a second time. Cisneros managed to make it a little further down the street before collapsing. Ivania and Carlos Salguero were watching

17

a movie in their house when they heard two gunshots and went outside to investigate. They both spoke with appellant. Appellant told Ivania to go back inside her house because he had shot someone and he told Carlos not to go over to where Cisneros was lying on the ground. Appellant then fled the scene.

Appellant later called Baza, apologizing "for what he did" and telling her that he was near a bayou that was minutes away from the scene of the shooting. When officers located appellant, they recovered a handgun from his waistband. Firearms testing revealed that two cartridge casings found at the scene of the shooting were fired from the handgun in appellant's possession at the time of his arrest. Gunshot residue testing revealed two particles of gunshot residue on appellant's right hand—an "inconclusive" result—and three particles on his left hand—a result leading to the conclusion that the particles "likely resulted from activity such as firing a weapon, being in close proximity to a firearm during discharge, handling a firearm, a fired cartridge, or some surface bearing [gunshot residue]."

We therefore conclude beyond a reasonable doubt that the erroneous admission of the written autopsy report did not contribute to appellant's conviction. *See* TEX. R. APP. P. 44.2(a); *Lee*, 418 S.W.3d at 899–901; *Wood*, 299 S.W.3d at 214–16.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Kelly, and Goodman.

Publish.  TEX. R. APP. P. 47.2(b).

19